**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
JUDAH HERZL HENKIN, et al.              )
                                        )
              Plaintiffs,               )
                                        )
      v.                                )         Civil Action No. 1:18-cv-01273
                                        )
ISLAMIC REPUBLIC OF IRAN, et al.        )
                                        )
              Defendants.               )
_____ )

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

PAGE NO.

I. INTRODUCTION………………………………………………………1

II. SUMMARY OF FINDINGS…………………………………………4

III. FINDINGS OF FACT…………………………………………...6

   A. HAMAS PERPETRATED THE OCTOBER 1, 2015 TERRORIST ATTACK THAT MURDERED EITAM AND NA'AMA HENKIN……..6

   B. HAMAS IS A FOREIGN TERRORIST ORGANIZATION……………14

   C. IRAN PROVIDED HAMAS WITH LOGISTICAL AND FINANCIAL SUPPORT TO ENABLE IT TO COMMIT THE OCTOBER 1, 2015 TERRORIST ATTACK THAT MURDERED EITAM AND NA'AMA HENKIN………………………………………………………15

   D. SYRIA PROVIDED HAMAS WITH LOGISTICAL AND FINANCIAL SUPPORT TO ENABLE IT TO COMMIT THE OCTOBER 1, 2015 TERRORIST ATTACK THAT MURDERED EITAM AND NA'AMA HENKIN………………………………………………16

   E. EITAM HENKIN AND THE HENKIN FAMILY PLAINTIFFS ARE UNITED STATES CITIZENS…………………………………..17

   F. THE HENKIN FAMILY PLAINTIFFS HAVE EACH SUFFERED INJURY…………………………………………………..18

     1. Rabbi Judah Herzl Henkin……………………………………18

     2. Anne Chana Henkin…………………………………………19

     3. Aderet Rivka Henkin…………………………...………………21

     4. Eliashir Elijah Henkin…………………………...………………22

     5. Jacob (Bechor Shalom) Henkin…………………….……………23

     6. Joseph Gil Henkin……………………………….……………24

     7. Taama Freida (Henkin) Yaakovson……………….…………..25

**IV. CONCLUSIONS OF LAW**................................................................**27**

    **A.  THE COURT ASSERTS SUBJECT MATTER JURISDICTION UNDER 28 U.S.C. § 1605A AND DEFAULT JUDGMENT MAY BE ENTERED**................................................................**27**

    **B.  THE ISLAMIC REPUBLIC OF IRAN IS LIABLE FOR THE MURDER OF EITAM HENKIN UNDER 28 U.S.C. § 1605A(c)**........................**33**

    **C.  THE SYRIAN ARAB REPUBLIC IS LIABLE FOR THE MURDER OF EITAM HENKIN UNDER 28 U.S.C. § 1605A(c)**...........................**35**

    **D.  UNDER FED. R. EVID. 201 THIS COURT TAKES JUDICIAL NOTICE OF THE NUMEROUS DECISIONS FINDING THAT IRAN AND SYRIA MATERIALLY SUPPORTED HAMAS IN ITS EXECUTION OF ACTS OF TERRORISM**.................................................**37**

    **E.  THE HENKIN FAMILY PLAINTIFFS ARE ENTITLED TO COMPENSATORY DAMAGES**..............................................**47**

    **F.  THE HENKIN FAMILY PLAINTIFFS ARE ENTITLED TO PUNITIVE DAMAGES**.................................................**52**

**V.    CONCLUSION**................................................................**57**

## I.  INTRODUCTION

On October 1, 2015, HAMAS, a designated Foreign Terrorist Organization ("FTO"), committed the terrorist attack that murdered Eitam Simon Henkin, an American citizen ("October 1, 2015 Terrorist Attack"). Eitam Simon Henkin, his wife, Na'ama, and their four children were driving home in their van past the town of Beit Furik when their vehicle was overtaken by three terrorists, who shot, wounded and killed Eitam and his wife. The evidence in this case makes clear that after the Henkin vehicle came to a stop, the terrorists came to the car. After a struggle between Eitam and one of the terrorists, he and his wife were shot and murdered in front of their children.  An investigation revealed that the attack upon the Henkin family was carried out by a HAMAS cell. The terrorists who planned and conducted the attack were HAMAS operatives. They were arrested and indicted for murder, confessing to the murders, and providing extensive details regarding their planning and the execution of the attack.

Plaintiffs have submitted evidence and expert testimony[1] in their Motion for Default Judgment pending before the Court as to Liability and Damages (D.E.21)   and request that the Court: (1) make independent findings of fact and conclusions of law that the terrorist attack in which Eitam Henkin and his wife, Na'ama, were murdered which resulted in the injuries to the parents and siblings of Eitam Henkin being the Plaintiffs in this case ("Henkin Family Plaintiffs"), was committed by HAMAS and should be

---

[1] Plaintiffs have submitted the Expert Report and testimony of Dr. Ronni Shaked.  See ECF 21-B.  In addition, on January 12 and 14, 2021, this Court held an evidentiary hearing in this case and the companion case of *Henkin v. Islamic Republic of Iran*, 19-cv-1184 *(Henkin II)* wherein the Court also heard testimony from Col. Arieh Spitzen, Dr. Matthew Levitt and Dr. Patrick Clawson, which the Court may rely on in making its independent findings of fact and conclusions of law. *Brown v. Plata*, 563 U.S. 493, 535, 131 S. Ct. 1910, 1942, 179 L. Ed. 2d 969 (2011) (Courts can, and should, rely on relevant and informed expert testimony when making factual findings).

attributed to HAMAS, a Foreign Terrorist Organization; (2) find that pursuant to Fed. R. Evid. 201 it may take judicial notice of prior judgments and adopt the findings of fact and conclusions of law entered in   related cases specifically including but not limited to adopting the findings of fact and conclusions of law in the Court's July 3, 2012 Findings of Fact and Conclusions of Law entered in the related cases of *Botvin, et al. v. Islamic of Republic of Iran, et al*., Civil Action No. 05-220 (RCL) (D.D.C.) ("Botvin I Case"); *Goldberg-Botvin, et al. v. Islamic of Republic of Iran*, Civil Action No. 12-1292 (RCL) (D.D.C.) ("Botvin II Case"); *Roth, et al. v. Islamic Republic of Iran, et al.*, Civil Action No. 11-01377 (RCL) (D.D.C.) ("Roth Case"); *Baxter, et al. v Islamic Republic of Iran, et al.* Civil Action Nos. 11-02133 (RCL) (D.D.C.) ("Baxter Case"); and *Steinberg, et al. v. Islamic Republic of Iran, et. al.* Civil Action No. 17-1910 (RCL) (D.D.C.) ("Steinberg Case") -- as well as numerous other decisions handed down by this Court -- regarding the providing of material support for HAMAS during the same time period with regard to the liability of both Defendants in the within action; *to wit,*  the Islamic Republic of Iran (hereinafter "Iran") and the Syrian Arab Republic (hereinafter "Syria"), both of which are designated State Sponsors of Terrorism; (3) make independent findings of fact and conclusions of law that Iran provided material support and sponsorship to HAMAS during the relevant time period; (4) make independent findings of fact and conclusions of law that Syria provided independent material support and sponsorship to HAMAS which furthered the terror attack at issue; (5) enter Default Judgment against the Defendants as to their joint and several liability on behalf of all Plaintiffs  pursuant to the private cause of action found in 28 U.S.C. § 1605A(c); and (6) find that the Plaintiffs suffered

economic loss and damages and make compensatory and punitive damages awards for each and all of the Plaintiffs commensurate with the damages evidence presented.

28 U.S.C. § 1608(e) provides that "no judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." To satisfy this burden, plaintiffs must present evidence concerning their backgrounds and injuries suffered, and also that the Court take judicial notice of prior findings of fact and evidence. *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 6–7 (D.D.C. 2011). This allows courts to "rely upon the evidence presented in earlier litigation ... without necessitating the formality of having that evidence reproduced." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 55 (D.D.C. 2010). 28 U.S.C. § 1608(e) does not require any more evidence or higher standard of evidence than the Court would ordinarily receive to render a judgment. *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994). To evaluate the Plaintiffs' proof the Court can "accept as true the plaintiffs' uncontroverted evidence." *Estate of Botvin ex rel. Ellis v. Islamic Republic of Iran*, 510 F. Supp. 2d 101, 103 (D.D.C. 2007). Moreover, the plaintiffs may establish their proof by affidavit. *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002).

At the request of the Court, an evidentiary hearing was held on January 10, 2021 and January 12, 2021 for the Plaintiffs in this case and in the coordinated *Henkin II* case to offer evidence of attribution to HAMAS for the October 1, 2015 Terrorist Attack. At

the hearing, Plaintiffs elicited expert testimony from Dr. Ronni Shaked[2] who was of the opinion that HAMAS, an FTO, was responsible for committing the October 1, 2015 Terrorist Attack. Shaked, Tr. Day 1 at 27, lines 2-5.   The Court also heard testimony from expert Col. Arieh Spitzen who concurred with Dr. Shaked's conclusion that HAMAS was the FTO responsible for committing this heinous attack, Spitzen, Tr. Day 1 at 85-86, lines 23-25;1-4 and that Iran and Syria were both State Sponsors of Terrorism and provided Hamas with the material support and means to carry out this terrorist ambush.   Levitt, Tr. 98-99, lines 25, 1-7, 12-17; Levitt Tr. 104, lines 16-18.   At the conclusion of the evidentiary hearing, counsel was directed by the Court to tender to the Court proposed findings of fact and conclusions of law for consideration by the Court.

Accordingly, the Plaintiffs propose that the Court enter the following Findings of Fact and Conclusions of Law as to the liability of the Defendants, jointly and severally, for the egregious and unforgiving conduct in providing material support for the acts of international terrorism committed against each of the Plaintiffs.

## II.  SUMMARY OF FINDINGS

The Court, having heard and reviewed the evidence, does hereby determine:

(a) that the terrorist ambush that killed Eitam Henkin, a United States citizen, on October 1, 2015 was an act of international terrorism;

(b) the October 1, 2015 Terrorist Attack was committed by HAMAS, the Islamic Resistance Movement, which has been designated by the US Department of State as a Foreign Terrorist Organization.

---

[2] The Transcript for the January 12, 14 2021 Evidentiary Hearing is cited with the following convention: (Witness' name, Tr. Day number at pg. number, line number)

- 4 -

(c) that HAMAS, at the time of and prior to the October 1, 2015 Terrorist Attack, was sponsored and supported by Defendant, the Islamic Republic of Iran, which has been and remains designated by the US Department of State as a State Sponsor of Terrorism.

(d) that HAMAS, at the time of and prior to the October 1, 2015 Terrorist Attack, was sponsored and supported by Defendant, the Syrian Arab Republic, which has been and remains designated by the US Department of State as a State Sponsor of Terrorism

(f) that together and independently Iran and Syria provided substantial and material support to HAMAS and each of them caused and are liable jointly and severally for the heinous acts of international terrorism against the Plaintiffs;

(g) that Defendants Iran and Syria each provided material support, resources, training, and support for the commission of the October 1, 2015 Terrorist Attack; and that the HAMAS agents, were trained and/or supported by the Defendants;

(h) Plaintiffs in this action, each of whom is a United States citizen, are each near family members of the deceased victim, Eitam Henkin; *to wit,* (1) his father, Rabbi Judah Herzl Henkin, now deceased, (2) his mother, Anne Chana Henkin, (3) his sister, Aderet Rivka Henkin, (4) his brother, Eliashir Elijah Henkin, (5) his brother, Jacob Bechor-Shalom Henkin, (6) his brother, Joseph Gil Henkin, and (7) his sister, Taama Freida Henkin Yaakovson. Accordingly, each has suffered their own compensable personal injuries as a result of Eitam's murder and are entitled to a judgment against Iran and Syria, jointly and severally, commensurate with the damages evidence presented in Plaintiffs' Motion for Default Judgment (D.E. 21) and Supplemental Evidence in Support of Plaintiffs' Motion for Default Judgment (D.E. 26).

Accordingly, the Court enters the Findings of Fact and Conclusions of Law set forth hereinafter below.

## III.   FINDINGS OF FACT

1. Plaintiffs brought this action pursuant to the provisions of the Foreign Sovereign Immunities Act, ("FSIA"), codified at 28 U.S.C. § 1602, *et seq*.

2. Defendant, the Islamic Republic of Iran, was served on December 19, 2018 with the Complaint, Summons, and Notice of Suit by diplomatic means pursuant to 28 U.S.C. § 1608(a)(4). D.E.14.

3. Iran did not answer or appear within the required time period and on May 6, 2019 the Clerk of Court entered default against Iran.  D.E. 17.

4. Defendant, the Syrian Arab Republic, was served on January 22, 2019 with a copy of the Summons, Complaint, Notice of Suit by diplomatic means pursuant to 28 U.S.C. § 1608(a)(4).  D.E. 15.

5. Syria did not answer or appear within the required time period and on May 6, 2019, the Clerk of Court entered default against Syria. D.E. 17.

6. The Court held an evidentiary hearing on January 12, 2021 and January 14, 2021 as required by 28 U.S.C. § 1608(e).  Minute Entry January 12, 2021 and January 15, 2021.

### A.   HAMAS PERPETRATED THE OCTOBER 1, 2015 TERRORIST ATTACK THAT MURDERED EITAM AND NA'AMA HENKIN

7. On October 1, 2015, HAMAS, a designated FTO, committed the terrorist attack that murdered Eitam Simon Henkin, an American citizen. Shaked Rep.[3] Ex. 1-A.

---

[3] The citation, "Shaked Rep." refers to the Report of Dr. Ronni Shaked filed with Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Default Judgment (D.E. 21, Ex. B). The Court qualified Dr. Shaked as

8. Eitam, his wife, Na'ama and their four children were driving home in their vehicle past the town of Beit Furik when the vehicle was overtaken by three terrorists, who shot and wounded Eitam. Shaked, Tr. 15, lines 10-18.

9. After the vehicle stopped, the terrorists approached the vehicle. After a struggle between Eitam and one of the terrorists, he and his wife were shot and murdered in front of their children. Shaked, Tr. 15-16, lines 23-25, 1-14.

10. An investigation revealed that the attack upon the Henkin family was carried out by a HAMAS cell. Shaked, Tr. 50-51, lines 16-19, 24-25, 1-3.

11. The terrorists who planned and conducted the attack were HAMAS operatives: Amjad Aliwi, Yahah Haj Hamad, Samir Kusa, Karam Rizq and Zayd Amer. Shaked, Tr. 50, lines 3-5.

12. The planning for the attack took place over two weeks by the HAMAS operatives. Shaked, Tr. 44, lines 10-12.  It was premeditated. Shaked, Tr. 44, lines 10-24 Preparations were made in great detail, including obtaining vehicles and arms. Shaked, Tr. 44, lines 22-23.

13. Each were arrested and indicted for murder, confessing to the murders, and providing extensive details regarding their planning and the execution of the attack. Shaked, Tr. 50, lines 6-11.

14. Attribution to HAMAS for the October 1, 2015 Terrorist Attack can be found because, *inter alia*, HAMAS took official responsibility for the attack in publications on HAMAS' official websites, including on the official website of

---

an expert under the Federal Rules for purposes of testifying on HAMAS and the attribution to HAMAS of certain terrorist attacks.  Shaked, Tr. 42, lines 5-13.

the Izz Adin al-Qassam Brigades a/k/a Al-Qassam Brigades, the military wing of HAMAS. Shaked Rep. ¶48.

15. In addition, publications appeared on websites that related directly to HAMAS. Shaked Rep. ¶48.

16. The responsibility for the attack was published with pictures of the terrorist cell members, pictures of the scene, and detailed articles about the terrorist cell members and how their modus operandi was carried out. Shaked, Tr. 55-63.

17. On the official HAMAS website in the section dedicated to "Organization Operations," there is a headline for the page which states "Itamar Operation." Shaked Rep. ¶49.

18. The announcement gives the following details: **Type of action**: planned ambush; **Place of Operation**: near Itamar settlement ("Itamar"); **Date**: 1.10.2015**; Lost to enemy**: two killed Zionist settlers. Shaked Rep. ¶49.

19. Attached to the announcement are four pictures depicting the scene of the murders of Eitam and Na'ama Henkin. Shaked Rep. ¶49.

20. In addition, on October 1, 2016, the one-year anniversary of Eitam Henkin's murder, the official website of the Al-Qassam Brigades, the military wing of HAMAS, published a video, about 50 seconds in length, and in its opening appears the official iconic emblem of the Al-Qassam Brigades. Shaked Rep. ¶50.

21. The title of the video is: "Itamar's Heroic Action." Shaked Rep. ¶50.

22. The date of the attack was highlighted in the video. Throughout the video, the Al-Qassam Brigades icon appears on the left side of the screen. Shaked Rep. ¶50.

23. The edited video is accompanied by pictures and captions describing the stages of the attack. Shaked Rep. ¶50; Shaked, Tr. 58, lines 11-18.

24. The video ends with the image of the Al-Qassam Brigades icon appearing in the center of the screen. Shaked Rep. ¶50.

25. Also, on October 1, 2016, the official website of the Al-Qassam Brigades published a detailed statement about the terrorist cell and its operation in Itamar which killed Eitam Henkin. Shaked Rep. ¶51; Shaked, Tr. 57, lines 1-17.

26. The members of the terrorist cell are referred to as "Heroes of Al-Qassam." *Id*. The announcement praises and glorifies the HAMAS members who carried out the attack and mentions the cell members' names. Shaked Rep. ¶51.

27. The name of Eitam Henkin is mentioned in the statements. Shaked Rep. ¶51.

28. Moreover, on June 23, 2016, immediately after the Israeli military court sentenced the convicted members of the HAMAS terrorist cell to life sentences for having carried out the Henkin attack, HAMAS spokesman Hussam Badran announced that the cell members had carried out the operation on behalf of the HAMAS organization.  Shaked Rep. ¶52; Shaked, Tr. 56, lines 16-22; Spitzen Tr. Day 2, 20, lines 8-12.

29. Badran praised the attack and the announcement was published on the Al-Qassam Brigades official website. Shaked Rep. ¶52.

30. The website shows a picture of the Henkins' car, and the pictures of the members of the terrorist cell who carried out the attack (near Itamar). Shaked Rep. ¶52.

31. On October 1, 2017, again on the anniversary of the murder, the official website of the Al-Qassam Brigades published a video, about one minute in length, describing the attack. Shaked Rep. ¶53; Shaked, Tr., 59, lines 17-25.

32. The video stated: "The attack in Itamar is the spark of the intifada and the power of revenge." Shaked Rep. ¶53.

33. On the right side of the screen, throughout the video, appears the official icon emblem of the Al-Qassam Brigades. Shaked Rep. ¶53; Shaked, Tr. 59, lines 21-22.

34. The video described the attack with photos and captions, with music in the background where sounds of automatic shots can be heard. Shaked Rep. ¶53.

35. At the end of the video, the Al-Qassam Brigades emblem appears and under it is the caption "Military information Department." Shaked Rep. ¶53.

36. On the Al-Qassam Brigades web page where the video is shown, mention is made that it is possible to view and follow the report on Facebook, Twitter, Telegram and Instagram. Shaked Rep. ¶53; Shaked, Tr. 61, lines 3-5.

37. The same publication of the video appeared on the Al-Qassam Brigades official website on October 1, 2018, and again, on September 30, 2019. Shaked Rep. ¶53; Shaked, Tr. 61-62, lines 14-25, 1-21.

38. HAMAS' official website also published a poster with pictures of members of the HAMAS terrorist cell who killed the Henkins, with photographs on the left of the attack and in the center of the poster, the official symbol of the HAMAS movement. Shaked Rep. ¶54; Shaked, Tr. 63, lines 1-19.

39. In addition to these direct publications taking responsibility and praising the perpetrators who committed the Henkin terrorist attack, there were also indirect publications made by HAMAS which involved praising the attack. Shaked Rep. ¶60.

40. For example, on October 7, 2015, after Israel's security forces demolished the houses of the terrorists who committed the murders, the official website of the Al-Qassam Brigades published a report about the demolitions and appended to the report photos of the cell members and a picture of the Henkin family's vehicle after they were attacked.  Shaked Rep. ¶60.

41. That same day, HAMAS flags were raised on the demolished houses. The flags were a proud message to city residents that the convicted terrorists belong to the HAMAS terrorist organization. Shaked Rep. ¶61.

42. Also that day, Osama Hamdan, who was in charge of HAMAS' foreign relations, was interviewed on HAMAS' satellite TV station and praised the terrorist operation against the Henkin couple, stating that the operation was a message to the enemy, referring to Israel. Shaked Rep. ¶62; Shaked, Tr. 55, line 6-17.

43. The official website of the Al-Qassam Brigades published Hamdan's remarks. Shaked Rep. ¶62; Shaked, Tr. 55, lines 20-21.

44. There were also statements made by HAMAS leaders praising and claiming responsibility for the attack and murder. Abu Obeida, spokesman for HAMAS' military-terrorist wing Al-Qassam, said, "We praised the heroic attack against Israeli civilians, it was the natural response." Shaked Rep. ¶68.

45. He also claimed that "this attack will not be the final response." Shaked Rep. ¶68.

- 11 -

46. HAMAS spokesman Husam Badran stated that HAMAS congratulated the "resistance fighters" on their "heroic action" in the West Bank. Shaked Rep. ¶69.

47. He claimed HAMAS regarded it as a response to "Israel's crimes" in the West Bank and against the Al-Aqsa mosque. Shaked Rep. ¶69.

48. He also appealed to the Palestinians to continue "such heroic actions because it is the only way to support the Palestinian people everywhere." Shaked Rep. ¶69.

49. Iyad al-Buzom, a spokesman for the HAMAS Interior Ministry in Gaza, also issued a statement wherein he praised the attack stating, "a greeting of glory and pride to the heroes who perpetrated this brave attack." Shaked Rep. ¶70.

50. Evidence of attribution to HAMAS is also clear from looking at publications in the Arab World. There have been dozens of articles about the HAMAS operation and the members of the terrorist cell that carried out the attack against the Henkins in Itamar which have been published in Palestinian media, in media throughout the Arab world, and in the Western media, including the United States. Shaked Rep. ¶¶71-83; Shaked, Tr. 64-65, lines 22, 1-18.

51. In addition, Israeli governmental sources, including the Prime Minister's Office, the Foreign Ministry and the Israeli Defense Forces ("IDF") confirmed that the terrorist attack was committed by HAMAS. Shaked Rep. ¶84; Shaked, Tr. 65-66, lines 20-25, 1-14.

52. The Israeli Foreign Ministry issued a detailed statement on the attack, emphasizing that the terrorists belong to HAMAS' military wing. Shaked Rep. ¶84.

53. The Israeli Security Services published an official announcement, emphasizing that the terrorist cell members belong to the HAMAS movement. Shaked Rep. ¶85; Spitzen, Tr. Day 2 at 33-34, lines 15-25, 1.

54. The announcement provided details about the terrorist cell members and the role of each one of them in committing the murder.  Shaked Rep. ¶85; Spitzen, Tr. Day 2 at 33 lines 15-23.

55. Israeli court documents confirm that the HAMAS terror cell members were tried and convicted by a military tribunal and were sentenced to life in prison. Shaked Rep. ¶88; Spitzen, Tr. Day 2 at 49, lines 1-15.

56. During their trials, the terrorists admitted that they are members of the Izz al-Din al-Qassam Brigades, the military wing of HAMAS, that they were HAMAS operatives and that HAMAS had committed the attack. Shaked Rep. ¶87; Spitzen, Tr. Day 2 at 49, lines 8-9.

57. Those cell members are presently and continue to be imprisoned in cells where HAMAS members are jailed separately by Israeli prison officials.  Shaked Rep. ¶88.

58. Accordingly, the Court finds that based on the detailed statements issued by HAMAS, the detailed evidence cited above including official documents from the Government of Israel, as well as the expert opinions of Dr. Shaked and Col. Spitzen and other evidence cited in Plaintiffs' Motion for Default Judgment, the October 1, 2015 Terrorist Attack in which Eitam and Na'ama Henkin were murdered was committed by HAMAS, a designated FTO.

B.    **HAMAS IS A FOREIGN TERRORIST ORGANIZATION**

59. HAMAS, both an acronym for Harakat al-Muqawama al-Islamiya (Islamic Resistance Movement) and an Arabic word meaning "zeal," is a Palestinian Islamist group that emerged in 1987 as an outgrowth of the Palestinian branch of the Egypt-based Muslim Brotherhood. Shaked Rep. ¶¶33-34, fn6.

60. HAMAS was founded in December of that year with the goal of eliminating the State of Israel and establishing in its place an Islamist state in all of what was once British Mandatory Palestine—a territory that today comprises Israel, the West Bank, and the Gaza Strip.   Shaked Rep. ¶¶34, 38.

61. In 1995, the United States Government designated HAMAS as a "Specially Designated Terrorist" entity pursuant to the International Emergency Economic Powers Act. 50 U.S.C. § 1701, 1702; Executive Order 12947, Prohibiting Transactions With Terrorists Who Threaten To Disrupt the Middle East Peace Process, 60 FR 5079, (Jan. 23, 1995).  Shaked Rep. ¶39.

62. In 1997, HAMAS was identified and labeled as a "Foreign Terrorist Organization." *See* Office of the Coordinator for Counterterrorism, Designation of Foreign Terrorist Organizations, October 8, 1997.  Shaked Rep. ¶39.

63. In 2001, the United States government designated HAMAS a Specially Designated Global Terrorist ("SDGT"), a designation HAMAS has retained through the present.  Executive Order 13224 – Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, Or Support Terrorism. Shaked Rep. ¶39.

64. Since its founding in 1987, HAMAS has committed countless acts of violence against both military and civilian targets, including suicide and other bombings, rocket, mortar fire, and shooting attacks. Shaked Rep. ¶36; Levitt Tr. 89, lines 11-20.

65. HAMAS takes great pride in its terrorist activities and wants the world to know when they murder people. Shaked Rep. ¶31; Shaked Tr. 66, lines 1-4.

**C.    IRAN PROVIDED HAMAS WITH LOGISTICAL AND FINANCIAL SUPPORT TO ENABLE IT TO COMMIT THE OCTOBER 1, 2015 TERRORIST ATTACK THAT MURDERED EITAM AND NA'AMA HENKIN.**

66. The government of the Islamic Republic of Iran has a long history of providing material aid and support for terrorism.  Levitt, Tr. 104, lines 16-18.

67. Iran provides significant financial support, exceeding millions of dollars per year. Clawson Tr. 60, lines 11-12; Levitt Tr. 108, lines 2-6.

68. Iran provides financing directly to HAMAS by transferring suitcases of cash to HAMAS.  Clawson Tr. 61, lines 11-12, 22-24; Levitt Tr. 108-109, lines 2-6, 21-25, 1-6.

69. Direct financial support to HAMAS is further provided by the Iranian national banks, Bank Saderat, Bank Melli and Bank Markazi, each of which are owned and controlled by Iran and are instrumentalities thereof.  Clawson, Tr. 66, lines 4-12; Clawson, Tr. 75, lines 20-22; Clawson Tr. 81, lines 5-18.

70. The named Iranian banking instrumentalities provide financial support to HAMAS. Clawson Tr. 72, lines 1-8; Clawson Tr. 74, lines 18-25; Clawson Tr. 77, lines 15-25; Clawson Tr. 78-79, lines 22-25, 1-8; Clawson Tr. 83, lines 5-18.

71. Iran also provides logistical support to HAMAS and military training to its members. Levitt, Tr. 111-113, lines 15-25, 1-25, 1-3; Clawson Tr. 62, lines 13-18, 22-25; Clawson Tr. 63, lines 1-4.

72. Iran intentionally selected the notoriously violent HAMAS, a Foreign Terrorist Organization, to commit acts of terrorism with the aid, support, sponsorship and involvement of Iran, intending that the HAMAS terrorist organization would carry out its terrorist operations with lethal brutal force designed to further Iran's governmental aims, goals, means, methods and geopolitical objectives. Shaked Rep. ¶36.

73. Iran also runs terrorist training camps of its own in Lebanon, aside from the Iranian-funded camps Hezbollah operates there.  Levitt, Tr. 112-113, lines 24-25, 1-3.

74. According to the US State Department, Iranian state sponsorship of HAMAS is critical not only in terms of providing the material and funds with which to carry out terrorist operations, but also the rhetorical support necessary to keep up the pace of such operations.  Clawson, Tr. 59-60, lines 23-25, 2-5.

75. It is uncontroverted that Iran provides significant financial aid and material support to HAMAS, without which HAMAS could not have carried out the October 1, 2015 Terrorist Attack in which Eitan Henkin and Na'ama Henkin were murdered.

**D.    SYRIA PROVIDED HAMAS WITH LOGISTICAL AND FINANCIAL SUPPORT TO ENABLE IT TO COMMIT THE OCTOBER 1, 2015 TERRORIST ATTACK THAT MURDERED EITAM AND NA'AMA HENKIN.**

76. The government of the Syrian Arab Republic also has a long history of providing material aid and support for terrorism.  Levitt, Tr. 98-99, lines 23-25,1-7. *Country Reports on Terrorism* at 287.

77. Syria provided safe haven and significant material support for the sponsorship and committing of terror to HAMAS beginning in 1999 when their headquarters were located in Damascus.  Levitt, Tr. 99-100, lines 20-25; 1-7.

78. Through Syria, HAMAS channeled financial support, smuggled weapons, and conducted training.  Levitt Tr. 104, lines 3-15.

79. Although HAMAS and Syria reportedly cut ties in 2012, HAMAS continued to benefit from the substantial support that it had received from Syria including up to the timeframe when HAMAS committed the Henkin murders. Shaked Rep.. ¶38; Levitt, Tr. 99, lines 8-17.

80. It is uncontroverted that Syria provided significant financial and material support to HAMAS, without which HAMAS could not have carried out the October 1, 2015 Terrorist Attack in which Eitam Henkin and Na'ama Henkin were murdered.

## E.    EITAM HENKIN AND THE HENKIN FAMILY PLAINTIFFS ARE UNITED STATES CITIZENS

80. Eitam Henkin was a United States citizen at the time of his murder.  Judah Henkin Decl. ¶3.

81. In addition, the Henkin Family Plaintiffs in this action are all United States citizens: *to wit;* Eitam Henkiin's father Rabbi Judah Herzl Henkin, now deceased, Judah Henkin Decl. ¶2; his mother, Anne Chana Henkin, Anna Chana Henkin

Decl. ¶2;  his sister, Aderet Rivka Henkin, Aderet Rivka Henkin Decl. ¶2;  his
brother, Eliashir Elijah Henkin, Eliashir Elijah Henkin Decl. ¶2; his brother, Jacob
Bechor-Shalom Henkin, Jacob Bechor-Shalom Henkin Decl. ¶2; his brother,
Joseph Gil Henkin, Joseph Gil Henkin Decl. ¶2;  and his sister, Taama Freida
Henkin Yaakovson, Taama Freida Henkin Yaakovson Decl. ¶2.

## F.  **THE HENKIN FAMILY PLAINTIFFS HAVE EACH SUFFERED INJURY**

### 1. Rabbi Judah Herzl Henkin[4]

82. Rabbi Henkin was the father of Eitam Henkin. Judah Henkin Decl. at ¶3.

83. The murder of Rabbi Henkin's son by HAMAS changed the complete course of
his life. *Id.* at ¶7.

84. Following the murder of his son, he and his family required therapy.  *Id.* at ¶8.
He and his wife saw a specialist, Ilana Goldberg, who specializes in Post-
Traumatic Stress Disorder (PTSD) to deal with their emotional trauma.  *Id.*  Ms.
Goldberg diagnosed Rabbi Henkin with PTSD and sent a report so advising to the
Israeli government entity which oversees such matters, Bituach Leumi.[5] *Id.* at Ex.
1.

85. In addition to the therapy that Rabbi Henkin received from Ms. Goldberg, his
family also received group counseling sessions from Dr. Naomi Baum.  *Id.* at ¶9.

86.  Rabbi Henkin explained that Eitam's murder caused him great loss. *Id.* at ¶10.
He no longer had a rabbinical protégé or study partner.  *Id.*

---

[4]After executing his Declaration, Rabbi Judah Herzl Henkin passed away on December 24, 2020.  Plaintiffs
have advised the Court that they will be filing a Motion to Substitute Party once his estate representative
has been named.
[5]Bituach Leumi is the National Insurance Institute of Israel and is the body responsible for the payment of
various allowances to those who are insured and eligible under the National Insurance Law of Israel.
https://www.btl.gov.il/English%20Homepage/About/Forms%20Authorization/Forms/Victims%20of%20H
ostilities/Pages/default.aspx

87. Rabbi Henkin suffered from Parkinson's Disease which was exacerbated because of his grief. *Id.* at ¶11. In the latter part of his life, he would fall quite a bit and his balance was affected. *Id.* at ¶13.

88. He was no longer able to enjoy the things he once was able to undertake such as playing guitar and writing. *Id.*

89. Rabbi Henkin explained that prior to his death he suffered unbearable pain as a result of the murder of his son and daughter-in-law and that it was difficult for him to go on with his daily life. *Id.* at ¶¶18-19.

**2. Anne Chana Henkin**

90. Anne Chana Henkin is the mother of Eitam Henkin. Anne Chana Henkin Decl. ¶3.

91. Mrs. Henkin was devastated by her son's murder. *Id.* at ¶15.

92. The murder of her son affected every aspect of her life. *Id.* at ¶6.

93. For the first half-year following the murder, she did not sleep well. *Id.* at ¶7.

94. She would relive the murder and think about the last moments of Eitam's life, struggling with the terrorists and surely knowing he and his wife would be killed. *Id.*

95. Mrs. Henkin still experiences these feelings today, including having continuing sleep issues and she has also struggled with weight gain which has affected her health. *Id.* at ¶¶7, 27.

96. Mrs. Henkin experienced stress relating to helping her son's children (her grandchildren) adjust and recover from the witnessing of and unbearable loss as a result of their parents' murder. *Id.* at ¶15.

97. Her life has further been affected by the deterioration of her husband's health, which worsened after her son's murder, and ultimately her husband's early death. *Id.* at ¶16.

98. Mrs. Henkin also battles her own fears of terrorism. *Id.* at ¶20.

99. She is frightened when any of her children travel. *Id.* She has lost interest in many of the activities she used to enjoy including walking, listening to music, cooking, travelling and celebrating occasions such as birthdays, and has refused to celebrate any birthdays since Eitam's murder. *Id.* at ¶21.

100. Work has also become difficult for Mrs. Henkin. *Id.* at ¶25. Mrs. Henkin founded and runs the Center for Higher Jewish Studies for Women, where Eitam would also lecture and was her designated successor as Dean. *Id.*

101. Mrs. Henkin, along with other members of her family, sought therapy to help her cope with her son's murder. *Id.* at ¶¶22-24.

102. From February 2016 to February 2017 she saw a therapist, Ilana Goldberg, on a weekly basis to help her deal with her emotional trauma. *Id.* at ¶23. Her therapist has diagnosed Mrs. Henkin with PTSD. *Id.*

103. In addition to the therapy Mrs. Henkin received from Ms. Goldberg, Mrs. Henkin also participated in group counseling sessions with her family with Dr. Naomi Baum. *Id.* at ¶24.

104. Eitam's murder has also affected Mrs. Henkin's relationships with and ability to help her other children. *Id.* at ¶26. She has found it difficult to even engage in conversations with her other children because she is overwhelmed with sadness. *Id.*

### 3. Aderet Rivka Henkin

105. Aderet Rivka Henkin is the sister of Eitam Henkin. Aderet Henkin Decl. ¶3.

106. On the day of her brother's murder, Aderet was watching TV with her husband and father-in-law, when the TV newscaster announced the terrorist attack. *Id.* at ¶5.

107. She immediately tried calling her brother because she knew the attack was near where he lived. *Id.* She was unable to reach her brother, and shortly thereafter Aderet received a phone call from her mother telling her that her brother Eitam and his wife, Na'ama were the victims of the terrorist attack. *Id.*

108. Since her brother's murder, Aderet has become and is more anxious and it is difficult for her to enjoy life as she had before his death. *Id.* at ¶8. She experiences extreme stress and is in a constant state of grieving, thinking about Eitam's final moments and death all the time. *Id.* at ¶¶8-9.

109. Aderet was very close to her brother growing up. *Id.* at ¶10. As children, they shared a room and spent a great deal of time together. *Id.* at ¶¶10-11. They experienced many activities together including walks, bike rides and playing computer games together. *Id.* at ¶11.

110. Eitam's murder has plagued Aderet with a permanent sense of fear of other family members being hurt, which has damaged her sense of security and ability to keep a normal routine. *Id.* at ¶15.

111. She has difficulty travelling. *Id.* at ¶¶15-16.

112. Her fears have also had an effect on her job at the supermarket where she works. *Id.* at ¶15.

113.    Aderet is fearful that her children will be hurt.  *Id.* at ¶20.  She is constantly

monitoring their whereabouts, which is very stressful and worrisome.  *Id.* at ¶¶20-

21.

114.    Aderet has participated in group family therapy sessions with Dr. Naomi Baum.

*Id.* at ¶22.    Even though she has attended these sessions, the therapy has not

helped too much. *Id.* at ¶23.  Her intense grief continues to this day; she says she

is "broken".  *Id.* at ¶¶19, 24.

**4.  Eliashir Elijah Henkin**

115.    Eliashir Elijah "Eliyahyu" Henkin, is the brother of Eitam Henkin, Declaration of

Eliashir Elijah Henkin at ¶3.

116.    Eliyahu was the family member who was responsible for identifying the body of

Eitam.    *Id.* at ¶7.  The images of that day continue to be seared in his mind and

will remain with him forever.  *Id.*

117.    Eliyahu and Eitam were very close as children.  Eliyahu would often take Eitam

to the park and during summer vacations he would take Eitam to Jerusalem for

trips. They would visit museums and libraries and read together.  They would

play legos, sports and train together in the martial arts.  *Id.* at ¶9

118.    As they grew up, although Eitam was Eliyahu's younger brother, Eitam became

Eliyahu's spiritual guide. *Id*. at ¶10.  Eliyahu took great comfort in having his

brother as his rabbi because he was able to discuss very private matters with

Eitam, because they were also brothers.  *Id*.   Losing Eitam in the terrorist attack

not only took away Eliyahu's brother, but his rabbi as well.  *Id*.

119. Today it is difficult for Eliyahu to find the energy to do his job as a weightlifting coach or pursue his hobbies such as weightlifting, tai chi, martial arts, hiking, writing, directing videos and cooking has been difficult since the murder of his brother. *Id*. at ¶12. This causes him both financial hardship and frustration because he cannot complete tasks as he once did. *Id*.

120. To help him cope with the pain and loss of his brother and his family, Eliyahu participated in group family therapy sessions with Naomi Baum. *Id.* at ¶17.

**5    Jacob (Bechor Shalom) Henkin**

121. Jacob (Bechor Shalom) Henkin, is the brother of Eitam Henkin, Declaration of Jacob Bechor-Shalom Henkin at ¶3.

122. On the day that Eitam was murdered, Jacob had been together with his family, including his brother Eitam, to celebrate the Jewish holiday of Sukkot. *Id.* at ¶4.

123. On the evening Eitam was killed, Jacob was at home with his parents. *Id. at* ¶6. He had heard about a nearby terror attack, but initially thought his brother was not involved. *Id.* He later learned that his brother and sister-in-law were murdered in the Itamar attack. *Id*.

124. Before his murder, Jacob and Eitam would see each other regularly; and they were very close. *Id.* at ¶11. Jacob would also see Eitam when he would teach at their mother's school, where Jacob also worked as a network administrator. *Id.*

125. The murder of Eitam affects Jacob in his life and in his job as a network administrator. *Id.* at ¶15. Prior to Eitam's murder, Jacob was working full time, now he is only able to work at 40-50%, so he can spend more time taking care of his family, particularly his father, who until his recent death, needed significantly

more help since Eitam's death.  *Id.* at ¶¶15-16.   *See also* Expert Report of Dr. Chad L. Staller and Dr. Stephen M. Dripps of the Center for Forensic Economics, Exhibit K attached to Plaintiffs' Notice of Supplemental Evidence in Support of Plaintiffs' Motion for Default Judgment (D.E. 27).

126. When he was alive, Jacob would assist his father with walking and would drive his father to appointments. *Id.* at ¶18.  He would maintain the family car, drive his nieces and nephews (Eitam's children) between the families for visits, and take responsibility for all the food shopping needs for the family.  *Id.* at ¶18.

127. All of the additional driving compounds Jacob's fears and anxiety.  *Id.* at ¶19. Jacob has become aggressive and angry because of his fear of encountering suspicious people on the road.  *Id.*   He has also cut off relationships with friends he used to see and has difficulty maintaining social relationships.  *Id.* at ¶20.

128. As a result of all his anxiety and fear, Jacob's health in general has deteriorated; he has experienced nightmares.  *Id.* at ¶24-27.

129. To help him cope with the pain and loss of his brother Jacob participated in group family therapy sessions with Naomi Baum. *Id.* at ¶28.

**6.    Joseph Gil Henkin**

130. Joseph Gil "Yagil" Henkin, is the brother of Eitam Henkin.  Declaration of Joseph Gil Henkin at ¶4.

131. On the day that Eitam was murdered, Yagil had been together with his family to celebrate the Jewish holiday of Sukkot.  *Id.* at ¶4.

132. Later that evening, Yagil received a phone call from his mother that she was worried because she could not reach his brother Eitam.  *Id.* at ¶5.  Yagil went

online and learned that it was in fact his brother Eitam and sister-in-law who had been murdered, but he did not know if his nieces and nephews had also been killed. *Id.* It was not until midnight that the family learned that Eitam's children had survived. *Id.* at ¶6.

133. Eitam and Yagil were very close, both as brothers and scholars. *Id.* at ¶8. Yagil is a military historian and Eitam was readying to study for a Ph.D. in history when he was murdered. *Id.* They would collaborate on research and exchange ideas. *Id.*

134. Growing up, Yagil and Eitam were very close and would play soccer together. *Id.* at ¶11. Yagil would visit Eitam when he was studying at his Yeshiva in Safed (Sefat). *Id.* at ¶12.

135. After and since Eitam was murdered, Yagil has found it difficult to work. *Id.* at ¶16. While he used to complete his books quickly, it has now taken him four years to complete a book that was almost finished at the time Eitam was killed. *Id.* His opportunity for tenure has diminished because of his decreased publication performance. *Id.* at ¶17. He has suffered significant economic loss. Expert Report of Dr. Chad L. Staller and Dr. Stephen M. Dripps of the Center for Forensic Economics, Exhibit J attached to Plaintiffs' Notice of Supplemental Evidence in Support of Plaintiffs' Motion for Default Judgment. (D.E.27)

136. To help him cope with the pain and loss of his brother, Yagil, along with the rest of his family participated in group family therapy sessions with Naomi Baum. *Id.* at ¶26.

**7.    Taama Freida (Henkin) Yaakovson**

137.  Taama Freida (Henkin) Yaakovson is the sister of Eitam Henkin.  Declaration of
      Taama Freida (Henkin) Yaakovson at ¶3.

138.  Taama learned about the murder of her brother and his wife on the night of the
      attack from her husband who came to visit her and deliver the news at the school
      where she worked, amidst a holiday party that she had organized for the students.
      *Id.* at ¶4.

139.  When they were children, Taama and Eitam would often play together.  *Id.* at ¶9.
      They played games such as hide and seek, tag and Marco Polo. *Id.* Eitam taught
      Taama to read.  *Id.*  Taama looked up to Eitam and she would often copy and try
      and emulate whatever he did.  *Id.*

140.  The murder of her brother and sister-in-law by HAMAS terrorists has changed the
      course of Taama's life.  *Id.* at ¶5.  Her sense of security has been damaged, as has
      her ability to keep to a normal daily routine.  *Id.* at ¶6.  She lives in constant fear
      of a family member being hurt.  *Id.*  She has lost interest in many activities she
      once enjoyed.  *Id.* at ¶18.  Because she now experiences times of intense sadness,
      she is not as available to her children.  *Id.* at ¶22.

141.  Taama has taken on the responsibility of preserving Eitam's legacy through
      memorial services and events.  *Id.* at ¶¶19-20.  Having this responsibility causes
      her great sadness, sleep disruption and strong feelings of heartbreak.  *Id.* at ¶20.
      Taama works as a social coordinator at a high school.  *Id.* at ¶21.  Her
      responsibilities include organizing certain events, but she had to stop planning
      two annual events–the Memorial Day ceremony and the party she was attending
      when she first heard about her brother's murder—because she cannot find the

power to do so.  *Id.* In fact, she is unable to go to work during the weeks leading up to these events because she cannot bear hearing her co-workers discuss them. *Id.*  This causes her much stress at the workplace.  *Id.* Every time terrorism is discussed, she is pulled back into her trauma.  *Id.*

142.  To help cope with her grief and loss, Taama has participated in group family therapy sessions with Naomi Baum. *Id.* at ¶23

## IV. <u>CONCLUSIONS OF LAW</u>

### A.  <u>THE COURT ASSERTS SUBJECT MATTER JURISDICTION UNDER 28 U.S.C. § 1605A AND DEFAILT JUDGMENT MAY BE ENTERED</u>

143.  The requirements for subject matter jurisdiction under 28 U.S.C. § 1605A allow Plaintiffs to seek money damages for personal injury or death if the damages were caused by:

a.  the provision of "material support or resources"[6] for hostage taking, torture, and an extrajudicial killing;

b.  if the provision of material support was engaged in by an official while acting within the scope of his office;

c.  the defendant was a "state-sponsor of terrorism" at the time the act complained of occurred; and

d.  the claimant or the victim was a "US national" at the time of the act of terrorism.  28 U.S.C. § 1605A(a)(1), (a)(2).

---

[6] 28 U.S.C. § 1605A(h)(3) defines "material support or resources" as "the meaning given that term in section 2339A of title 18."   18 U.S.C. § 2339A(b) defines "material support or resources" as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel."

144.    Here, the Plaintiffs have established that this Court has subject matter jurisdiction because the Defendants have provided material support or resources, including currency or monetary instruments, financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, and personnel for hostage taking, torture, and an extrajudicial killing. 18 U.S.C. § 2339A(b); *see supra,* Sec. III(C)(D).

145.    The Islamic Republic of Iran was listed by the US Department of State as a state sponsor of terrorism in 1984; was so listed at the time of the attacks; and remains so listed. *See supra,* Sec. III(C).

146.    The Syrian Arab Republic was also listed by the US Department of State as a state sponsor of terrorism, having been listed in 1979; was so listed at the time of the attacks; and remains so listed. *See supra,* Sec. III(D).

147.    The Plaintiffs, and each of them, as the victims are or were United States nationals at the time of the October 1, 2015 Terrorist Attack in which Eitam Henkin and Na'ama Henkin were each brutally murdered.  *See supra*, Sec. III(E).

148.    Plaintiffs have proven beyond their burden under 28 U.S.C. § 1605A that the Islamic Republic of Iran provided material support and resources, as defined by 18 U.S.C. § 2339A(b) to HAMAS and its network of terrorists for hostage taking, torture, and extrajudicial killings on a scale such that the imposition of vicarious liability for the acts of HAMAS terrorists being attributed to HAMAS, a designated FTO, is required under 28 U.S.C. § 1605A(c).  *See supra*, Sec. III(C).

149. Plaintiffs have proven beyond their burden under 28 U.S.C. § 1605A that the Syrian Arab Republic provided material support and resources, as defined by 18 U.S.C. § 2339A(b) to HAMAS and its network of terrorists for hostage taking, torture, and extrajudicial killings on a scale such that the imposition of vicarious liability for the acts of HAMAS terrorists being attributed to HAMAS, a designated FTO, is required under 28 U.S.C. § 1605A(c.) *See supra*, Sec. III(D).

150. Proof of aiding and abetting or conspiracy necessarily proves that Iran and Syria provided material support or resources to HAMAS and its terrorist network. *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 691–92 (7th Cir. 2008).

151. Plaintiffs further have introduced compelling evidence of Iran and Syria's cooperation and support of HAMAS and its terrorist network as discussed below in the context of Iran and Syria's joint and several liability for the death and personal injuries resulting from the October 1, 2015 Terrorist Attack.

152. Plaintiffs have presented uncontroverted and compelling evidence that Iran and Syria each and both supported HAMAS and its terrorist network's efforts to launch terrorist attacks to kill and injure Americans and Israeli citizens and to disrupt any normalization of relations between Arab states and Israel and against the interests of the government of the United States of America. Thus, the first and second elements to allow the Court to assert subject matter jurisdiction are satisfied.

153. The third element required to be established asks whether the defendant foreign sovereign was a "state-sponsor of terrorism" at the time the act complained of

- 29 -

occurred.    28 U.S.C. § 1605A(a)(2)(A)(i)(I).    The term "state-sponsor of terrorism" is defined by the statute at 28 U.S.C. § 1605A(h)(6):

> the term 'state sponsor of terrorism' means a country the government of which the Secretary of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371), section 40 of the Arms Export Control Act (22 U.S.C. 2780), or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism . . . .

154.    The Islamic Republic of Iran has been identified as a state sponsor of terrorism since January 19, 1984. *See e.g.*, *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 65 (D.D.C. 2015) (citations omitted). The Syrian Arab Republic has been identified as a state sponsor of terrorism since January 19, 1984. *Estate of Steinberg*, 2019 WL 6117722, at *2. Accordingly, the third element is clearly established.

155.    The fourth element required to be established asks whether the victim or claimant was a U.S. national at the time of the act of terrorism.    28 U.S.C. § 1605A(a)(2)(A)(ii).  28 U.S.C. § 1605A(h)(5) defines a U.S. national as defined in 8 U.S.C. § 1101(a)(22), in part, as "a citizen of the United States."

156.    The U.S. citizenship of decedent Eitam Henkin who was savagely murdered by the Iran and Syria sponsored HAMAS terrorists establishes subject matter jurisdiction for the Court for the claims of the Henkin Family Plaintiffs each of whom was at the time of the murder and continue to be today, a United States citizen. *See supra*, Sec. III(E).    Accordingly, the jurisdiction of the Court on behalf of the Henkin Family Plaintiffs is clearly established.

157.    Once the immunity of a foreign state has been lifted and the Court asserts subject matter jurisdiction, 28 U.S.C. § 1606 defines the sources of law that may be applied against a foreign sovereign.

> Once a foreign state's immunity has been lifted under Section 1605 and jurisdiction is found to be proper, Section 1606 provides that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. Section 1606 acts as a "pass-through" to substantive causes of action against private individuals that may exist in federal, state or international law.

*Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 265-266 (D.D.C. 2006) *quoting Dammarell v. Islamic Republic of Iran*, CA No. 01-2224, 2005 U.S. Dist. LEXIS 5343, at *27-32 (D.D.C. Mar. 29, 2005).

158.    In this case, a federal cause of action exists under 28 U.S.C. § 1605A(c), along with state law causes of action where they would not lead to an impermissible duplicative recovery.

159.    The Court looks to common law as illustrated by the Restatement (Second) of Torts when seeking to define the federal causes of action under 28 U.S.C. § 1605A(c) to fulfill the requirement of 28 U.S.C. § 1606 that non-immune foreign sovereigns shall be liable as would a private individual. *See Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003).

160.    Finally, 28 U.S.C. § 1608(e) provides that "no judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044,

1047 (D.C. Cir. 2014) ("when the defendant State fails to appear and the plaintiff seeks a default judgment, the FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring *only* that it be 'satisfactory to the court.'"), *citing* 28 U.S.C. § 1608(e) (emphasis added).

161.    To satisfy this burden, plaintiffs must present evidence concerning their backgrounds and injuries suffered and also may request the Court take judicial notice of prior findings of fact and evidence from a related proceeding. *See e.g.*, *Taylor*, 811 F. Supp. 2d at 6–7.

162.    This allows courts to "rely upon the evidence presented in earlier litigation . . . without necessitating the formality of having that evidence reproduced." *Murphy*, 740 F. Supp. 2d at 55.  28 U.S.C. § 1608(e) does not require any more evidence or a higher standard of evidence than the Court would ordinarily receive to render a judgment. *See Han Kim*, 774 F.3d at 1046 (finding that because the defendants "'[had] not participated in the proceedings' . . . the plaintiffs 'cannot be expected to meet a typical standard for judgment as a matter of law.'"); *see also Commercial Bank of Kuwait*, 15 F.3d at 242 (explaining that 28 U.S.C. § 1608(e) does not require "evidentiary hearings or explicit findings where the record shows that the plaintiff provided sufficient evidence in support of its claims.").

163.    Here, default judgment as to liability against Iran is proper given the Plaintiffs have clearly demonstrated that (1) HAMAS committed the October 1, 2015 Terrorist Attack in which Eitam Henkin was murdered resulting in the injuries to the Henkin Family Plaintiffs and (2) Iran is jointly and severally liable to the

Plaintiffs under 28 U.S.C. § 1605A(c) for its role in sponsoring and providing massive amounts of material support to HAMAS at the relevant times. Accordingly, as Iran has been served with Summons, Complaint and Notice of Suit, as required under 28 U.S.C. § 1608(a), and  Iran has failed to answer, and default having been entered by the Clerk of Court, judgment may now be entered by this Court finding  Iran jointly and severally liable for the Plaintiffs' injuries, suffering, losses and damages.

164.    Default judgment as to liability  against Syria is also proper given the Plaintiffs have demonstrated that (1) HAMAS committed the October 1, 2015 Terrorist Attack in which Eitam Henkin was murdered resulting in the injuries to the Henkin Family Plaintiffs and (2) Syria is jointly and severally liable to the Plaintiffs under 28 U.S.C. § 1605A(c) for its role in sponsoring and providing massive amounts of material support to HAMAS at the relevant times. Accordingly, as Syria has been served with Summons, Complaint and Notice of Suit, as required under 28 U.S.C. § 1608(a), and Syria having failed to answer, and default having been entered by the Clerk of Court, judgment may now be entered by this Court finding Syria jointly and severally liable for the Plaintiffs' injuries, suffering, losses and damages.

165.    Having found that the Court has subject matter jurisdiction over the Plaintiffs' Claims and that default judgment may be entered, the Court now turns to its Conclusions of Law regarding the liability of Iran and Syria, jointly and severally, for the Plaintiffs' claims.

B.    **THE ISLAMIC REPUBLIC OF IRAN IS LIABLE FOR THE MURDER OF EITAM HENKIN UNDER 28 U.S.C. § 1605A(c).**

166. The 2008 amendments to the FSIA expanded the legal mechanisms for determining the civil liability of state sponsors of terrorism.  These amendments created a new private right of action under federal law that operates against any foreign state that is or was a state sponsor of terrorism as described in subsection 28 U.S.C. § 1605A(a)(2)(A)(i) and any official, employee or agent of that foreign state while acting within the scope of his or her office, employment or agency.  28 U.S.C. § 1605A(c).

167. 28 U.S.C. § 1605A(c) allows claims to be brought against the state sponsor of terrorism if the claimant or the victim was, at the time of the terrorist act, a national of the United States, as were each and all of the Henkin Family Plaintiffs who are victims and Plaintiffs here.  Claims may be brought under 28 U.S.C. § 1605A(c) for "personal injury or death caused by" the acts of terrorism as described in 28 U.S.C. § 1605A(a)(1), such as when the "official, employee or agent of that foreign state" engages in the "provision of material resources or support" for "extrajudicial killing" or "hostage taking".  For these acts by a foreign state's officials, employees or agents the "foreign state shall be vicariously liable for the acts of its officials, employees or agents . . . ."

168. Iran has been designated as a State Sponsor of Terrorism since 1984.  *Estate of Steinberg*, 2019 WL 6117722, at *2; *Country Reports on Terrorism* at 284. "Iran has historically provided weapons, training, and funding to HAMAS and other Palestinian terrorist groups...." *Id.* at 285. HAMAS serves as a proxy for the Islamic Republic of Iran.  *Shaked Decl*. at ¶38.   Iranian support of HAMAS is

well-documented by the State Department. *Estate of Steinberg,* 2019 WL 6117722. *See also Roth*, 78 F. Supp. 3d at 388–89.

169. Accordingly, it is clear that Iran provides significant financial and material support to HAMAS, without which HAMAS could not have carried out the quantity and quality of attacks from indiscriminate suicide bombings and heinous and murderous shooting attacks, including the October 1, 2015 Terrorist Attack in which Eitam and Na'ama Henkin were murdered.

## C.    THE SYRIAN ARAB REPUBLIC IS LIABLE FOR THE MURDER OF EITAM HENKIN UNDER 28 U.S.C. § 1605A(c).

170. In addition to finding Iran liable as a state sponsor of terrorism and sponsor of HAMAS, this Court should also find that the Syrian Arab Republic is jointly and severally liable for their timely and critical material support to HAMAS.  Like Iran, Syria may be held liable under 28 U.S.C. § 1605A if it (1) provided "material support or resources" for hostage taking, torture, and an extrajudicial killing;  (2) if the provision of material support was engaged in by an official while acting within the scope of his office; (3) the defendant was a "state-sponsor of terrorism" at the time the act complained of occurred; and (4) the claimant or the victim was a "US national" at the time of the act of terrorism.  28 U.S.C. § 1605A(a)(1), (a)(2).

171. The evidence that Syria provided material support and resources, as defined by 18 U.S.C. § 2339A(b), to HAMAS is on a scale such that the imposition of liability under 28 U.S.C. § 1605A(c) is required.   Syria has been designated as a State Sponsor of Terrorism since 1979. *Estate of Steinberg*, 2019 WL 6117722, at *2; *Country Reports on Terrorism* at 287.

172.  For purposes of satisfying the requirements of 28 U.S.C. § 1605A(a)(1), it is further noted that for years Syria provided safe haven and significant material support for the sponsorship of and committing of terror to HAMAS beginning in 2000. *Estate of Steinberg*, 2019 WL 6117722, at *2.

173.  When a foreign sovereign allows a terrorist organization to operate from its territory, such as facilitating diplomatic, fundraising, and arms smuggling activities, this meets the statutory definition of "safehouse" under 18 U.S.C. § 2339A(b).

> Insofar as the government of the Republic of Sudan affirmatively allowed and/or encouraged al Qaeda and Hezbollah to operate their terrorist enterprises within its borders, and thus provided a base of operations for the planning and execution of terrorist attacks -- as the complaint unambiguously alleges -- Sudan provided a "safehouse" within the meaning of 18 U.S.C. § 2339A, as incorporated in 28 U.S.C. § 1605(a)(7). *Owens v. Republic of Sudan*, 412 F. Supp. 2d 99, 108 (D.D.C. 2006).

174.  This Court has noted that "HAMAS undertook to carry out acts of extrajudicial killing and terrorism against Jews in Israel, the West Bank and Gaza, and in return Syria undertook to provide HAMAS with material support and resources to carry out such extrajudicial killings and terrorist attacks." *Estate of Steinberg*, 2019 WL 6117722, at *2; *Roth*, 2018 WL 4680270, at *3 (*quoting Braun*, 228 F. Supp. 3d at 71).

175.  HAMAS as a terrorist group operated its headquarters out of Damascus until 2012. *Id.* "In fact, Syrian military intelligence worked closely with HAMAS military leaders in Syria, and [i]nstructions for terrorist attacks were transmitted directly from Damascus to the terrorist cell that was to carry out the attack." *Id.*

176.  Through Syria, HAMAS channeled financial support, smuggled weapons, and conducted training. *Id.*

177.  Although HAMAS and Syria reportedly cut ties in 2012 following the Syrian civil war rift, HAMAS continued to benefit from the substantial support that it had received from Syria including up to the timeframe when HAMAS committed the Henkin murders. *Id.*

178.  Accordingly, it is clear that Syria provides significant financial and material support to HAMAS, without which HAMAS could not have carried out the quantity and quality of attacks from indiscriminate suicide bombings and heinous and murderous shooting attacks, including the October 1, 2015 Terrorist Attack in which Eitam and Na'ama Henkin were murdered.

**D.    UNDER FED. R. EVID. 201, THIS COURT TAKES JUDICIAL NOTICE OF THE NUMEROUS DECISIONS FINDING THAT IRAN AND SYRIA MATERIALLY SUPPORTED HAMAS IN ITS EXECUTION OF ACTS OF TERRORISM.**

179.  In a default proceeding, the Plaintiffs' burden of proof is "evidence satisfactory to the court."  *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003).   All uncontroverted evidence is accepted as true.  *Id.*

180.  This Court can take judicial notice of evidence in the judicial records of related cases because "the judicial records 'establishing the type and substance of evidence that was presented to earlier courts' [are] 'not subject to reasonable dispute.'" *Opati v. Republic of Sudan*, 60 F. Supp. 3d at 73 (quoting *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 172 (D.D.C. 2010) (citing Fed. R. Evid. 201(b)); *Oveissi v. Islamic Republic of Iran,* 879 F. Supp. 2d at 50; *Valore*

*v. Islamic Republic of Iran*, 700 F. Supp. at 59; *see Booth v. Fletcher*, 101 F.2d at 679 n.2 ("A court may take judicial notice of, and give effect to, its own records in another but interrelated proceeding . . . .").

181. "The objective issue of what the evidence was—rather than the subjective determination of what the evidence means—is thus a proper exercise of judicial notice." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d at 172.

182. "A court clearly may judicially notice its findings of facts and conclusions of law in related cases . . . . At issue is the effect of such notice." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d at 59.

183. Even though "courts generally cannot take notice of findings of fact from other proceedings *for the truth asserted therein* because these are disputable and usually are disputed   . . . the FSIA does not require this Court to relitigate issues that have already been settled in previous decisions." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d at 58 (emphasis added).

184. "Instead, the Court may review evidence considered in an opinion that is judicially noticed, without necessitating the re-presentment of such evidence." *Id*.

185. As shown herein, in more than a dozen terrorism exception cases, this Court rendered default judgment against FSIA defendants by finding facts and making legal conclusions anew based on the evidence considered in judicially noticed opinions. *See infra,* ¶189 (a-p).

186. Moreover, in FSIA litigation concerning terrorist attacks, on numerous occasions this Court has gone one step further and found that a Foreign Terrorist Organization committed an act of terrorism based solely on "adopting" prior

decision's findings of fact and conclusions of law "in their entirety." *See, e.g.*, *Oveissi*, 768 F. Supp. 2d at 7; *Estate of Brown v. Islamic Republic of Iran*, 872 F. Supp. 2d at 40 (accepting "the issue of liability as [having] been [entirely] settled" by the court's judicial notice of "the findings of fact and conclusions of law in [a previous case] with respect to all issues of liability"); *Ben Rafael v. Islamic Republic of Iran*, 718 F. Supp. 2d at 31 ("Based on prior [findings and holdings] in *Ben-Rafael I*, 540 F. Supp. 2d at 43-51, the Court reaffirms its ruling that plaintiffs here established their claims "by evidence satisfactory to the court" and reenters default judgment as to defendant Iran."); *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d at 54.

187.   In addition, this Court has specifically found that HAMAS committed certain acts of terrorism based on judicially-noticed findings of fact and conclusions of law drawn from prior decisions. *See, e.g.*, *Roth v. Islamic Republic of* Iran, 2015 U.S. Dist. LEXIS, at *4, *24 (D.D.C Jan. 27, 2015) (taking judicial notice of evidence received in *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 95 (D.D.C. 2006) and in *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258 (D.D.C. 2003) to find that HAMAS committed the act of terrorism at issue); *Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93, 96, 103 (D.D.C. 2012) (taking judicial notice of facts found in a prior proceeding to find that HAMAS was responsible for a bus bombing); *Beer v. Islamic Republic of Iran*, 2010 U.S. Dist. LEXIS 129953, at *7–8, *9 (D.D.C 2010) (concluding, "[b]ased on judicial notice of" evidence presented in a prior proceeding that was not in "reasonable dispute," that HAMAS committed the bus bombing at issue).

188.  This Court has, on numerous occasions, concluded that Iran and Syria, and each of them, were liable for providing various kinds of material support to HAMAS for the express purpose of enabling HAMAS to launch various terrorist attacks resulting in the injury and/or murder of American citizens.

189.  This Court takes judicial notice of the following decisions, which enable it to conclude that Iran and Syria materially supported HAMAS:

   a.  In *Steinberg v. Islamic Republic of Iran*, the Court found that on July 2014, HAMAS terrorists launched rocket propelled grenades at an Israeli armored vehicle killing Max Steinberg and six others. *Estate of Steinberg*, 2019 WL 6117722, at *1.  The Court found Iran, as well as Syria, liable for the attack and found that Iran has historically provided weapons, training, and funding to HAMAS and other Palestinian terrorist groups, and that the historical Iranian support of HAMAS is well-documented by the State Department and acknowledged by this Court.  *Id.*  The Court further found that "through Syria, HAMAS channeled financial support, smuggled weapons, and conducted training."  *Id.* at *2

   b.  In *Roth v. Islamic Republic of Iran*, this Court found that on August 9, 2001 HAMAS detonated a ten-pound bomb at a Sbarro restaurant. 2015 U.S. Dist. LEXIS 9390, *5 (D.D.C. Jan. 27, 2015). This Court found Iran liable for the attack because it provided material support to HAMAS as early as 1999. *Id.* at *9, *24 (finding that defendants (1) provided substantial support to HAMAS through provision of money and training and (2) encouraged the escalation of terrorist activities, including against

Israeli targets; that these acts have a reasonable connection to the at-issue attack ultimately carried out by HAMAS; and that this is sufficient to establish proximate cause under the FSIA).  The Court further found that Syria was also jointly and severally liable for the same August 9, 2001 attack. *Roth v. Syrian Arab Republic,* 2018 WL 4680270, at *4;

c.   In *Goldberg-Botvin v. Islamic Republic of Iran*, the court found that on September 24, 1997, HAMAS detonated several cases of powerful explosives at the crowded Ben Yehuda Street pedestrian mall in Jerusalem, Israel. 938 F. Supp. 2d 1, 5 (D.D.C. 2013). This Court found Iran liable for the attack because it provided material support to HAMAS as early as the early 1990's. *Id.* at 7, 9 (finding that Iran provided substantial support for HAMAS' terrorist activities for the purpose of undertaking attacks in Israel, funneled money and material support to HAMAS, and played necessary planning, logistical and support roles leading up to the bombing);

d.   In *Estate of Botvin v. Islamic Republic of Iran*, the Court found that on September 24, 1997, HAMAS detonated several cases of powerful explosives at the crowded Ben Yehuda Street pedestrian mall. 873 F. Supp. 2d at 234. The Court found Iran liable for the attack because it provided material support to HAMAS as early as the "early 1990's." *Id.* at 237–38 (finding that Iran provided financial, technical and other material support to HAMAS and other terrorist groups, including Hezbollah and the Palestinian Islamic Jihad, at the time of the at-issue bombing in Israel);

e.  In *Beer v. Islamic Republic of Iran*, the court found that on June 11, 2003, HAMAS detonated a bomb on Egged bus No. 14A in Jerusalem, Israel. 2010 U.S. Dist. LEXIS 129953, at *12. The court found Iran liable for the attack because it provided material support to HAMAS "well before the attack in 2003." *Id.* at 11, *6 (Nov. 9, 2010) ("Beer II") (finding that Iran "routinely provided financial and other assistance to HAMAS—constituting material support under the FSIA" which led to HAMAS' June 11, 2003 "bombing of Egged bus 14A");

f.  In *Wachsman ex rel. Wachsman v. Islamic Republic of Iran*, the court found that in October 1994, HAMAS abducted and executed Nachshon Wachsman, a U.S. citizen residing in Israel. 603 F. Supp. 2d 148, 151 (D.D.C. 2009). The court found Iran liable for the attack because it provided material support to HAMAS as early as 1992. *Id.* at 154 (finding that Iran's official foreign policy is to support terrorism by providing economic and training support to HAMAS, that Iran funnels its financial support through its Ministry of Information and Security, and that Iran provides professional military and terrorist training through the Iranian Revolutionary Guard);

g.  In *Beer v. Islamic Republic of Iran (Beer II),* the court found that on June 11, 2003, Hamas detonated a bomb on Egged bus No. 14A in Jerusalem, Israel. 574 F. Supp. 2d 1, 5 (D.D.C. 2008). The court found Iran liable for the attack because it provided material support to Hamas leading up to the 2003 attack. *Id.* at 7, 9 (finding that (1) Iran has been designated a state

sponsor of terrorism continuously since January 19, 1984 and was so designated at the time of the at-issue attack in Israel; (2) each of the plaintiffs was a U.S. national at the time the bombing occurred; and (3) Iran knowingly provided material support to Hamas, the entity that committed the at-issue attack in Israel; and treating MOIS as the state of Iran itself so that the same determinations apply to MOIS conduct);

h. In *Kirschenbaum v. Islamic Republic of Iran*, the court found that on December 1, 2001, HAMAS detonated a bomb at the Ben Yehuda Street pedestrian mall in Jerusalem, Israel. 572 F. Supp. 2d 200, 204 (D.D.C. 2008). The court found Iran liable for the attack because it had "continuously" provided material support to HAMAS. *Id.* at 209, 210 (finding that Iran knowingly provided material support to HAMAS, the entity that committed the attack, and treating MOIS as the state of Iran itself so that the same determinations apply to the conduct of MOIS);

i. In *Bennett v. Islamic Republic of Iran*, the court found that on July 31, 2002, HAMAS detonated a bomb at the Frank Sinatra Cafeteria Building on the campus of Hebrew University in Jerusalem, Israel. 507 F. Supp. 2d 117, 121 (D.D.C. 2007). The court found Iran liable for the attack because it had "continuously" provided material support to HAMAS. *Id.* at 123–24 (explaining that HAMAS, aka the Islamic Resistance Movement, is an organization supported by Iran dedicated to waging a holy war employing terrorism with the object of seizing the leadership of the Palestinian people

and asserting sovereignty and the rule of the Muslim religion over all of the area of Palestine, including all territory of the State of Israel);

j.  In *Sisso v. Islamic Republic of Iran*, the court found that on September 19, 2002, HAMAS detonated a bomb on Bus No. 4 in Tel Aviv, Israel. 2007 U.S. Dist. LEXIS 48526, at *1 (D.D.C. July 5, 2007). The court found Iran liable for the attack because it had "intentionally provided material support [to HAMAS] in furtherance of that terrorist activity in the years leading up to and including 2002." *Id.* at 11 (finding that Iran and MOIS knowingly and substantially provided material support and resources to HAMAS in furtherance of HAMAS' terrorist activities, such as the September 19, 2002 Tel Aviv bus bombing); *Id.* (finding that "Iran and MOIS have aided and abetted HAMAS' goal of Islamic jihad through perpetration of terrorist attacks in the West Bank, Gaza, and within Israel, and HAMAS has been encouraged by Iran to continue and increase such attacks, often acting in return for direct financial compensation from Iran for specific terrorist acts," and therefore that plaintiff may recover against Iran and MOIS for intentional infliction of emotional distress);

k.  In *Bodoff v. Islamic Republic of Iran*, the court found that on February 25, 1996, HAMAS detonated a bomb on Egged bus No. 18. 424 F. Supp. 2d 74, 77 (D.D.C. 2006). The court found Iran liable for the attack because it had provided material support to HAMAS in the years "immediately preceding the attack." *Id.* at 79, 85 (finding that defendants Iran conspired

with, and providing material support to, HAMAS in furtherance of the terrorist suicide bus bombing that caused the death of Yonathan Barnea);

l.  In *Greenbaum v. Islamic Republic of Iran*, the court found that on August 9, 2001, HAMAS detonated a bomb at a Sbarro restaurant in Jerusalem, Israel. 451 F. Supp. 2d at 94. The court found Iran liable for the attack because it had provided material support to HAMAS as early as 2000 including "the period immediately preceding the attack." *Id.* at 97 (finding that Iran actively provided material support to Hamas between 2000-2001 "at a fever pitch");

m. In *Campuzano v. Islamic Republic of Iran*, the court found that on September 4, 1997, HAMAS carried out a triple suicide bombing at the crowded Ben Yehuda Street pedestrian mall in Jerusalem, Israel. 281 F. Supp. 2d at 260. The court found Iran liable for the attack because it had provided material support to HAMAS as early as 1995.  *Id.* at 262 (finding a bombing committed by HAMAS would not have occurred without material support from Iran);

n.  In *Stern v. Islamic Republic of Iran*, the court found that on July 30, 1997, HAMAS carried out a double suicide bombing at the Mahane Yehuda outdoor produce market in downtown Jerusalem, Israel. 271 F. Supp. 2d 286, 289 (D.D.C. 2003). The court found Iran liable for the attack because it had provided material support to HAMAS as early as 1994. *Id.* at 291, 298–299 (finding that Iran provided HAMAS with massive amounts of material support and resources, including military training of hundreds of

operatives, for the express purpose of carrying out terrorist attacks such as the bombing on July 30, 1997);

o. In *Weinstein v. Islamic Republic of Iran*, the court found that on February 25, 1996, HAMAS detonated a bomb on Egged bus No. 18 in Jerusalem, Israel. 184 F. Supp. 2d 13, 15 (D.D.C. 2002). The court found Iran liable for the attack because it had provided material support to Hamas as early as 1995. *Id.* at 19, 21–22 (explaining, in detailed findings of fact, that Iran provided large-scale material and technical support to HAMAS which enabled HAMAS to commit certain bus bombings and which earned Iran a place on the U.S. Department of State's list of nations that support terrorism);

p. In *Bluth v. Islamic Republic of Iran* the court found Iran as a "state sponsor of terrorism" who provided "material support or resources" to Hamas. Case No. CV 12-250 (GK), 2016 WL 4491760, at *2 (D.D.C. Aug. 25, 2016). Having found that Hamas was responsible for the March 7, 2002 attack in Atzmona, Israel the court held that Iran is liable under § 1605A(c) for any personal injuries caused by HAMAS' attack;

q. In *Fraenkel v. Islamic Republic of Iran et. al.,* the court found that in June 2014, HAMAS was liable for the hostage taking and murder of three young men, including American Yaakov Naftali Fraenkel, and that Syria had provided material support to HAMAS at the time of the attack. *Fraenkel*, 248 F. Supp. 3d at 31; and

r.  In *Braun v. Islamic Republic of Iran* the court found Iran and Syria to be "state sponsors of terrorism" who each provided material support and resources to HAMAS, and having found that HAMAS was responsible for the October 22, 2014 attack that murdered Chaya Zissel Braun.  Case No. CV 15-1136 (BAH) (D.D.C January 10, 2017).  For their material support of HAMAS, the Court found both the Islamic Republic of Iran <u>and</u> the Syrian Arab Republic jointly and severally liable under § 1605A(c) for the damages caused by HAMAS by the terrorist attack.

190.  Judicial notice of judicial records, especially in the FSIA context, allows courts to avoid "'relitigat[ing] issues that have already been settled' in previous decisions." *Murphy*, 740 F. Supp. 2d at 58 (*quoting Brewer*, 664 F. Supp. 2d at 55); *see Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 31 (D.D.C. 2012) ("When a court has found facts relevant to a FSIA case . . . , courts in subsequent, related cases may 'rely upon the evidence presented in earlier litigation . . . without necessitating the formality of having that evidence reproduced.'") (*quoting Taylor*, 811 F. Supp. 2d at 6–7).

191.  Therefore, in light of the numerous decisions in this Circuit wherein Iran and Syria have each been found liable for providing material support to HAMAS, this Court finds Iran and Syria jointly and severally liable for the injuries suffered by the Plaintiffs and enters default judgment against Iran and Syria, jointly and severally, in the favor of each and all of the Henkin Family Plaintiffs in the within action.

**E.**  <u>**THE HENKIN FAMILY PLAINTIFFS ARE ENTITLED TO COMPENSATORY DAMAGES**</u>

192. 28 U.S.C. § 1605A(c), the Foreign Sovereign Immunities Act (FSIA), provides for an exception for bringing cases against foreign states for "personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking or the provision of material support or resources for such an act…" 28 U.S.C. § 1605(a)(1).

193. 28 U.S.C. § 1605A(c) provides a private right of action for a foreign state to be held liable to,

    (1) a national of the United States,
    (2) a member of the armed forces,
    (3) an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or
    (4) the legal representative of a person described in paragraph (1), (2) or (3) for the personal injury or death caused by acts described in subsection (a)(1) of that foreign state or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages.  In such an action, damages may include economic damages, solatium, pain and suffering, and punitive damages. 28 U.S.C. § 1605A(c).

194. Here, each of the Henkin Family Plaintiffs is a national of the United States, and accordingly they may bring a private cause of action for their individual compensatory damages, which includes, but is not limited to, their economic loss and solatium claims.  *Id.*

195. Economic loss damages can be recovered pursuant to section 1605A(c). Such damages may be proven by the submission of a forensic economist's expert report. *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 402 (D.D.C. 2015). Here, the Plaintiffs have submitted expert reports to support their claims for economic

loss from of Dr. Chad L. Staller and Dr. Stephen M. Dripps of the Center for Forensic Economics. *See* Plaintiffs' Notice of Supplemental Evidence in Support of Plaintiffs' Motion for Default Judgment, Exhibits J and K.

196. Damages for solatium are to compensate for "the mental anguish, bereavement[,] and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent['s] society and comfort." *Valore*, 700 F. Supp. 2d at 85 (*citing Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009)).

197. Under the FSIA, a solatium claim is indistinguishable from an IIED claim. *Id.*

198. Relying principally on the Restatement (Second) of Torts, this Court has set out the following standard for recovery on a theory of IIED in 28 U.S.C. § 1605A(c) cases: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) (quoting Restatement (Second) of Torts § 46 (1965)).

199. A party can be held liable for an IIED action if (1) the party who is claiming the emotional distress/loss of solatium is a member of the victim's immediate family, as we have in the instant action, and (2) the conduct complained of was sufficiently outrageous and intended to inflict severe emotional distress, as we have in the instant action. *See Murphy,* 740 F. Supp. 2d at 75.

200. The "immediate family" requirement is strictly construed in FSIA cases—generally, only spouses, parents, siblings, and children are entitled to

recover. *Id.* As to the issue of presence, this Court has previously held that one "need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result." *Estate of Steinberg*, 2019 WL 6117722, at *7 *citing Valore,* 700 F. Supp. 2d at 80.

201. This is because terrorism is sufficiently extreme and outrageous to demonstrate that it is intended to inflict severe emotional harm on even those not present at the site of the act. *Id.*

202. As indicated above and in the uncontroverted Henkin Family Plaintiffs declarations attached to Plaintiffs' Memorandum of Law in Support of Motion for Default and cited herein, each of the Henkin Family Plaintiffs experienced a high and severe degree of emotional distress and loss as a direct and proximate result of the murder of Eitam Henkin by the HAMAS terrorists. The fact that the family members were not at the site of the attack, is not a requirement for their solatium claims. *Id.* at 8.

203. The Court has in previous decisions on behalf of victims of state sponsored terrorism established a standard for solatium damages under the FSIA. The general rule of the Court is that parents of deceased victims should each receive a baseline award of $5 million in damages, and siblings should each receive a baseline award of $2.5 million in damages. *Estate of Heiser*, 466 F. Supp. 2d at 269.

204. These amounts may fluctuate from the baselines if there are aggravating circumstances, such as a "general feeling of permanent loss or change caused by decedent's absence," *Murphy*, 740 F. Supp. 2d at 79 (*quoting Flatow v. Islamic*

*Republic of Iran*, 999 F. Supp. 1, 31 (D.D.C. 1998)), or other "circumstances that appreciably worsen a claimant's pain and suffering." *Murphy*, 740 F. Supp. 2d at 79 (*quoting Greenbaum*, 451 F. Supp. 2d at 108).

205.   Aggravating circumstances allow the Court considerable discretion to increase a plaintiff's damages by substantial amounts. *See Valore*, 700 F. Supp. 2d at 86 (solatium damages increased by 25% due to aggravating circumstances); *Greenbaum*, 451 F. Supp. 2d at 108 (solatium damages increased by $1 million due to aggravating circumstances).

206.   In *Wultz v. Islamic Republic of Iran*, the court increased the plaintiff's baseline award from $5 million to $7 million because the plaintiff directly witnessed his son's body impacted by shrapnel, and also later suffered Post-Traumatic Stress Disorder ("PTSD"). *Wultz*, 864 F. Supp. 2d at 40.

207.   There are similar aggravating circumstances in this case which justify an upward departure from the conventional baseline in the solatium damages calculation for each of the Henkin Family Plaintiffs.

208.   Courts in the District of Columbia have held that a plaintiff is entitled to recover for her own emotional distress when (1) extreme and outrageous conduct on the part of the Defendants (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress. *Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984) (citations and internal quotations omitted).

209.   Actual physical injury is not necessary to establish intentional infliction of emotional distress. *Bodoff*, 424 F. Supp. 2d at 85–86; *See also Howard University*, 484 A.2d at 985(*citing Waldon v. Covington*, 415 A.2d 1070, 1076

(D.C. 1980) (noting that "an action for intentional infliction may be made out even in the absence of physical injury or impact")).

210.    Accordingly, this Court finds that the Henkin Family Plaintiffs in this action have each and all demonstrated their compensatory damages, including but not limited to their severe emotional injury, such to entitle each of them to an award of damages. Moreover, because of the demonstrated emotional distress to which they each have averred in their Declarations, the Court finds that upward departures from the *Heiser* baseline awards are warranted for each of the Plaintiffs in this matter and accordingly the Court awards to each of the Henkin Family Plaintiffs the sums set forth in the attached schedule for their compensatory damages each has suffered and endured as a result of the tragic and heinous murder of their beloved son and brother, Eitam Henkin.

**F.      THE HENKIN FAMILY PLAINTIFFS ARE ENTITLED TO PUNITIVE DAMAGES**

211.    Punitive damages serve to "punish and deter the actions for which they are awarded." *Murphy*, 740 F. Supp. 2d at 80.

212.    Four factors determine the amount of punitive damages: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Id.*

213.    Punitive damage awards under the FSIA serve multiple purposes:

[They] are designed to "punish [the defendant] for [its] outrageous conduct and to deter [it] and others like [it] from [engaging in] similar conduct in the future." Restatement (Second) of Torts § 908(1); *see Bodoff v. Islamic Republic of Iran*, 907 F.Supp.2d 93, 105 (D.D.C. 2012); *accord*

> *Oveissi v. Islamic Republic of Iran*, 879 F.Supp.2d 44, 55-56 (D.D.C. 2012). "Punitive damages are warranted where 'defendants supported, protected, harbored, aided, abetted, enabled, sponsored, conspired with, and subsidized a known terrorist organization whose modus operandi included the targeting, brutalization and murder of American citizens and others.' " *Braun*, 228 F.Supp.3d at 86 (*citing Baker*, 775 F.Supp.2d at 85)

*Estate of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 148 (D.D.C. 2018)

214. 28 U.S.C. § 1605A(c) specifically allows the award of punitive damages for personal injury or death resulting from an act of state-sponsored terrorism. In recognition of the difficulty of bringing terrorists to justice personally, Congress created jurisdiction over, and rights of action against, their foreign state sponsors. *Flatow*, 999 F. Supp. at 33.

215. Therefore, in addition to the traditional focus of punitive damages upon individual punishment and general deterrence, this law emphasizes specific deterrence of the transgressing state sponsors of terrorism; and references the disabling effect of cumulative awards of punitive damages, so that future sponsorship may be prevented.

216. In this case, the evidence shows that these particular Defendants, both the Islamic Republic of Iran and the Syrian Arab Republic, have materially and continuously supported, protected, harbored, aided, abetted, enabled, sponsored, provided safe haven to and conspired with and subsidized a known terrorist organization, *to wit*, HAMAS, whose modus operandi includes the targeting, brutalization and murder of American citizens and others. The character of these acts requires an award of punitive damages. *E.g., Cronin v. Islamic Republic of Iran*, 238 F. Supp. 2d 222, 235 (D.D.C. 2002) (finding the character of the defendant's act—where the

defendant provided material support and resources to terrorist organizations to carry out acts such as kidnapping and torture—supported a punitive damage award of $300,000,000.00).

217.   Premeditated violence against civilian targets is not a legitimate action by any government.  It does not matter whether such violence is undertaken directly or indirectly.  Civilized society cannot tolerate states whose partnership with terrorist groups like HAMAS is formed for the purpose of achieving foreign policy goals through the murder and torture of innocent persons. Thus, in deciding that an award of punitive damages is necessary, this Court is especially cognizant of the purpose of the state-sponsor of terrorism exception to the FSIA.

218.   Specifically, in cases that have calculated the punitive damages for state sponsors of terrorism, such as *Acosta v. The Islamic Republic of Iran*, 574 F. Supp. 2d 15, 31 (D.D.C. 2008), this Court held that a three times multiplier should be applied to the state sponsor of terrorism's annual budget for terrorism in order to determine an appropriate punitive damage award to adequately deter state sponsors of terrorism.

219.   In *Estate of Heiser*, 659 F. Supp. 2d at 30–31, this Court saw no reason to depart from the *Acosta* methodology in calculating punitive damages as this methodology was considered to have the requisite deterrent effect. *See Id.*

220.   In *Valore*, this Court upheld the methodology in *Heiser* and *Acosta* but used a five times multiplier of annual state sponsored terrorism expenditures, rather than the three times multiplier used in *Heiser* and *Acosta*.   The court held specifically that two numbers are at issue: the multiplicand-the amount of [the state sponsor of

terrorism's] annual expenditures on terrorist activities-and the multiplier-the factor by which the multiplicand should be multiplied to yield the desired deterrent effect. *Id.*

221.    In *Valore*, this Court awarded one billion dollars in punitive damages against Iran.

222.    In *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53 (D.D.C. 2008), the measure applied by the court in awarding $300 million dollars was $150 million dollars per family for each of the two families.  Judge Collyer found that with regard to Syria's sponsorship of terrorism in the year of 2004, "[p]remeditated violence against civilian targets is not a legitimate action by any government. Civilized society cannot tolerate states whose partnership with terrorist surrogates…is formed for the purpose of achieving political victory through heinous acts of barbarism". *Gates*, 580 F. Supp. 2d at 74. Courts have also used a multiplier of three to five times the amount of compensatory damages awarded to determine an appropriate punitive damages amount.  *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 126 S. Ct. 1235, 163 L. Ed. 2d 1097 (2006).

223.    Syria was first placed on the US Department of State List of State Sponsors of Terror in 1979 when the list was first created, and Iran was placed on the list in 1984.  Syria and Iran have each continuously remained and remain to this day as a designated State Sponsors of Terror. Congress, in enacting provisions enabling the award of punitive damages against state sponsors of terror did so, *inter alia*, in order to hold those governments legally accountable, to punish them and to hopefully deter them from doing so.

224.  Considering each of the stated purposes of punitive damages, noting that both Syria and Iran have provided and continue to provide material support to HAMAS, a Foreign Terrorist Organization, and notwithstanding the fact that this Court has entered numerous and multiple significant awards for both compensatory and punitive damages against both the Islamic Republic of Iran and the Syrian Arab Republic, it is clear that their conduct remains undeterred with regard to their ongoing and continuing providing of material support that enables HAMAS to commit heinous acts of terror, year after year.  Iran and Syria are unrepentant in their support for terror.

225.  The decision of this Court is intended to send the loudest message possible that continued support for terror will not be countenanced, not only for deterrence purposes, but also to punish these rogue nations for their outrageous and sustained support of terror, this Court will impose a punitive damages award against both the Islamic Republic of Iran and the Syrian Arab Republic, jointly and severally, that the Court deems to be fair, just and proper under the circumstances.

226.  The evidence and testimony in this case demonstrates in the clearest of terms that the plan, scheme and design of the heinous attack upon the Henkin vehicle and family was to kidnap the Henkins in order to use them as bait and hostages for a desired prisoner swap for HAMAS prisoners incarcerated in Israeli prisons as a result of the conviction of innumerable HAMAS terrorists who have similarly committed heinous acts of terror.   The Court finds this reprehensible conduct to be unconscionable, intolerable, and unacceptable and one that merits this Court's

award of significant punitive damages against the Defendants, Iran and Syria, and each of them, jointly and severally.

227.   This Court further notes that over the past decades, tens of billions of dollars of Judgments have been entered by this Court and others in this Circuit against both the Islamic Republic of Iran and the Syrian Arab Republic, and each of them, for their heinous sponsorship and providing of material support to their proxy foreign terror organizations, including but not limited to HAMAS and others.

228.    While no amount of punitive damages will compensate the Henkin Family Plaintiffs for their unbearable loss and the damage it has caused and will continue to cause, the Court awards punitive damages with the purpose to not only punish and deter, but also serve as a disabling mechanism to help stop the continued ability of the Islamic Republic of Iran and the Syrian Arab Republic to provide funding to terrorist organizations.

## IV.         CONCLUSION

WHEREFORE, for the reasons set forth above, this Court having received and reviewed all the evidence, heard testimony, arguments and upon the complete record, the Court hereby enters the above stated findings of fact and conclusions of law. A separate judgment, awarding to each of the Plaintiffs compensatory and punitive damages as enumerated therein and consistent herewith, will be entered by the Court against the Defendants, the Islamic Republic of Iran and the Syrian Arab Republic, jointly and severally, in accordance with these Findings of Fact and Conclusions of Law.

This _____ day of_____2021.

_____
**Senior Judge Royce C. Lamberth**

PROPOSED BY:

Dated: March 4, 2021                    Respectfully Submitted,

                                        By:  */s/ Richard D. Heideman*
                                             */s/ Tracy Reichman Kalik*

                                        HEIDEMAN NUDELMAN & KALIK, P.C.
                                        Richard D. Heideman (No. 377462)
                                        Noel J. Nudelman (No. 449969)
                                        Tracy Reichman Kalik (No. 462055)
                                        Joseph H. Tipograph (No.997533)
                                        5335 Wisconsin Ave, Suite 440
                                        Washington, DC  20015
                                        Telephone:  202-463-1818
                                        Telefax:  202-463-2999