UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JUDAH HERZEL HENKIN, et al., ) | |
| ) | |
|     Plaintiffs, ) | |
| ) | |
| v. ) | Case No.: 1:18-cv-1273 (RCL) |
| ) | |
| THE ISLAMIC REPUBLIC OF IRAN, et al., ) | |
| ) | |
|     Defendants. ) | |

**REPORT OF SPECIAL MASTER RE:**
**THE ESTATE OF JUDAH HERZEL HENKIN, ANNE CHANA HENKIN,**
**JACOB BECHOR-SHALOM HENKIN, JOSEPH GIL HENKIN,**
**ELIASHIR ELIJAH HENKIN, ADERET RIVKA HENKIN STERN**
**AND TAAMA FREIDA HENKIN YAAKOVSON**

The Estate of Rabbi Judah Herzel Henkin, Anne Chana Henkin, Jacob Bechor-Shalom

Henkin, Joseph Gil Henkin, Eliashir Elijah Henkin, Aderet Rivka Henkin Stern, and Taama

Freida Henkin Yaakovson bring this action under 28 U.S.C. § 1605A.  They seek compensatory

relief for the death of Eitam Simon Henkin, who was viciously murdered by Hamas terrorists on

October 1, 2015.  In accordance with the Administrative Plan Governing Special Masters, the

Federal Rules of Civil Procedure 53, and the Federal Rules of Evidence, the Special Master has

received testimonial and documentary evidence to assist in formulating and recommending

damages to which these claimants may be entitled.

## BACKGROUND

On October 1, 2015, Eitam and Naama Henkin were driving with their children through

the West Bank in Israel when their car was overtaken by a vehicle driven and occupied by three

members of a Hamas terrorist cell.  Findings of Fact and Conclusions of Law ("FFCL") at ¶¶ 82-

84.  ECF No. 29.  One terrorist, Yahya Muhammad Naif Abdallah Haj Hamad ("Hamad"), fired

his M16 at the Henkin's car, wounding Eitam and forcing him to pull his car to the side of the road. *Id.* ¶¶ 85-86. Hamad and another terrorist, Karam Lutfi Fathi Rizq al-Masri ("Rizq"), approached Eitam's car on foot. Hamad focused his attention on the passenger side, where Eitam's wife, Naama sat, while Rizq concentrated on Eitam. *Id.* ¶ 87. They intended to kidnap and exchange them for Hamas prisoners. *Id.* ¶ 88. That plan was scuttled when Eitam struggled with and disarmed Rizq, prompting Hamad to open fire, killing Eitam and wounding Rizq. *Id.* Minutes later, Hamad shot and killed Naama at close range. *Id.* ¶ 89. The terrorists fled the scene leaving the bodies of Eitam and Naama. The couple's four children – M.H.H. (nine years old), N.Y.H. (seven years old), N.E.H. (four years old), and I.Z.H. (ten months old) remained alive and physically unharmed in the back seat of the car. ¶¶ 79, 90-91.

## PROCEDURAL HISTORY

Plaintiffs, including Eitam's parents and siblings, filed their Complaint on May 31, 2018 (ECF No. 1), requesting compensatory and other relief for the brutal October 1, 2015 murder of Eitam and Naama Henkin – an act facilitated by defendants Islamic Republic of Iran ("Iran") and the Syrian Arab Republic (Syria) and perpetrated by its Hamas proxies. Plaintiffs seek redress (1) under 28 U.S.C. § 1605A(c) for extreme mental anguish, physical injury, pain and suffering resulting from Eitam's death (Count I); (2) under 28 U.S.C. § 1605A(c) or the laws of the District of Columbia or the laws of the State of California for loss of solatium (Count II); and (3) redress under 28 U.S.C. § 1605A(c) or the laws of the District of Columbia for intentional infliction of emotional distress (Count III). Count IV consists of a request for punitive damages.

Plaintiffs served Iran on December 19, 2018, ECF No 14, and Syria on January 22, 2019, ECF No. 15, via diplomatic channels, pursuant to 28 U.S.C. § 1608(a)(4). Defendants' failure to

answer by the statutorily imposed deadlines prompted plaintiffs to move for an entry of default, ECF No. 16, which the Clerk of Court entered on May 6, 2019.  ECF Nos. 17, 18.

On August 27, 2019, plaintiffs moved for default judgment as to liability against Iran and Syria, asking the Court to "take judicial notice of related proceedings and records in cases before the same court and examine other cases in this Court which issued judgments based upon HAMAS' responsibility for the murder and injuries of U.S. citizens."  ECF No. 21-1 at 15. Following an evidentiary hearing convened on January 12 and 14, 2021, the Court, on July 12, 2021, issued a Memorandum & Opinion, ECF No. 29, Findings of Fact and Conclusions of Law, ECF No 30, and a Finding of Liability, ECF No. 31.

On July 27, 2021, plaintiffs moved to appoint the undersigned as special master. ECF No. 32).  On August 4, 2021, the Court granted plaintiffs' request, ECF No. 34, and directed the special master to "consider all issues related to compensatory and/or punitive damages."  Order of Appointment (1:18-cv-01273-RCL) at 2.

## THE SOLATIUM CLAIMS OF THE IMMEDIATE
## FAMILY MEMBERS OF EITAM HENKIN

### Evidence Supporting Claims of Rabbi Judah Herzel Henkin – Eitam Henkin's Father

In support of his prayer for compensatory relief, Rabbi Judah Henkin supplied a declaration dated August 19, 2020 ("JHH-Decl."), a copy of his Birth Certificate and a Certificate of Marriage Registration.  Rabbi Henkin also provided a document entitled "Summary of Treatment with Rabbi Yehuda and Rabbanit Chana Henkin," dated February 28, 2017, ("Treatment Summary") generated by Ilana Goldberg, a "psychotherapist" along with a letter drafted by Naomi Baum, Ph.D., a psychologist, entitled "Summary of Intervention: Henkin Family" ("Intervention Letter").

Rabbi Henkin died on December 24, 2020.  *See* Motion to Substitute Party (May 13, 2022), ECF No. 36.  By Order dated December 20, 2022, the Court substituted Anne Henkin as his legal representative.  ECF No. 44.

**Testimony**

Rabbi Judah Henkin was born in 1945 in Pennsylvania, married Anne Chana in 1971, and moved to Israel in 1972.  JHH-Decl. ¶ 2.  A U.S. citizen since birth, Rabbi Henkin later adopted dual citizenship with Israel.  *Id*.  Rabbi Henkin and Anne had six children: Jacob, Joseph, Eliashir, Aderet, Eitam, and Taama.  *Id*. ¶ 3.

In his testimony, Rabbi Henkin recounts how, on October 1, 2015, Eitam, Naama, and their four children were driving past the town of Beit Furik when "Hamas terrorists shot at his car from their vehicle," wounding Eitam, JHH-Decl. ¶ 5, who managed to pull over to the side of the road as the terrorists approached.  *Id*.  Although "severely wounded," Eitam "struggled" with his attackers "but was shot dead, together with his wife, in front of their kids."  *Id*.  "One terrorist accidentally shot another terrorist, and the terrorists ran away," which "apparently saved the kids from death or kidnapping."  *Id*.

As a result of the attack, Rabbi Henkin suffered "extreme injuries," including "extraordinary grief, fear, stress and anxiety, extreme mental anguish, exacerbation of my physical deterioration, pain and suffering, severe emotional distress and loss of the affection, love, society, and companionship of my loved son, Eitam, all of which continue to affect me to this day."  JHH-Decl. ¶ 6.  The murder of Rabbi Henkin's son forever "changed the course" of his life.  *Id*. ¶ 7.

Rabbi Henkin grieved "for a long time after the murder."  JHH-Decl. ¶ 10.  He had always anticipated Eitam would follow a tradition set down by Rabbi Henkin and his ancestors,

who were a renowned and distinguished "family of Rabbis." *Id*. Rabbi Henkin has always played "an important role" in his community and has authored "a modern orthodox treatise on Jewish law and customs." *Id*. His grandfather "was one of the greatest rabbinical minds in the western world," who "wrote in-depth commentaries and was qualified as a religious authority." *Id*. Rabbi Henkin expected Eitam, who was his "protégé" as well as his "study partner" and "friend," to be "one of the great rabbis and continue our family tradition." *Id*. Rabbi Henkin observed his son "developing all of the qualities that I was losing as I aged, such as learning, playing guitar, innovative thinking, and more." *Id*. Those hopes and aspirations were "destroyed" when Eitam was murdered, leaving Rabbi Henkin "with an emptiness that would never and could never be refilled." *Id.*

Rabbi Henkin believes his grief "exacerbated" his Parkinson's Disease. JHH-Decl. ¶ 11. He laments how the "sadness, stress and trauma" make it "difficult" for him to "regulate and express" his emotions, causing him "outbursts of pain and terrible crying." *Id*. He requires "much more help and attention from his family" to assist with basic functions, as his ability to speak and walk have been compromised. *Id*. ¶ 12. Since the attack, Rabbi Henkin's balance and stability have deteriorated. As a result, he falls more frequently and can no longer engage in tasks he once loved, such as playing guitar and writing. *Id*. ¶ 13. Rabbi Henkin believes his "process of aging has sharply accelerated," a condition he attributes to a lack of exercise "due to his not leaving home for long periods." *Id*. ¶ 14. He also lives in "permanent fear" of other family members getting hurt. *Id*. ¶ 15.

To Rabbi Henkin, Eitam "was a key member of the family" with the "ability to effectively solve conflicts inside the family." JHH-Decl. ¶ 16. Since his murder, the family has found it more difficult to resolve internal differences, as Eitam is no longer present to "bridg[e]

between the different perspectives and wills of family members." *Id*.  Eitam's death has left Rabbi Henkin and his wife, Anne, with "insufferable sadness," diminishing their quality of life and "rob[bing]" them of their mental strength." *Id*. ¶ 19.

**Evidence Supporting Claims of Anne Chana Henkin – Eitam Henkin's Mother**

Anne Henkin's prayer for relief is supported by her declaration dated August 19, 2020 ("AH-Decl."), and the Treatment Summary generated by Ilana Goldberg.  Anne also furnished a copy of her birth certificate and a copy of her expired U.S. passport.

**Testimony**

Anne Henkin was born in September 1946 in New York.  AH-Decl. ¶ 2.  She married Rabbi Henkin in 1971 and moved to Israel in 1972.  Anne, a U.S. citizen by birth, assumed dual citizenship with Israel after immigrating.  *Id*.

In her declaration, Anne describes how, on October 1, 2015, Eitam and his family were driving home "from a reunion of his high school class, when his car was shot up by Hamas terrorists."  AH-Decl. ¶ 5.  Anne was later informed the "terrorists were part of a Hamas cell that had prepared for months and were looking to perpetrate a 'quality' terror attack upon Jews living in communities in Israel."  *Id*.  The terrorists ran toward Eitam and his family, one armed with a submachine gun and the other with a revolver.  *Id*.  She cringes at the thought of her son's "final moments on Earth," when "he bled to death, unarmed and with his bare hands wrestled the revolver away from one of the two murderers as he tried to save his wife and children."  *Id*.  The other terrorist fired the submachine gun at Eitam and Naama at "point blank range," accidentally wounding another attacker.  *Id*.  The "terrorists then retreated to a waiting car and fled the scene, leaving behind two dead parents strewn across a blood-soaked car, and terrified, sobbing children."  *Id*.  Anne attributes the children's survival to Eitam's heroic actions.  *Id*.  Visiting the

site shortly after the attack, Anne saw "the sharp skid marks on the road, where our wounded son managed to halt the car safely." *Id*.

For the "first half year following the murder," Anne awoke every morning "choking with pain" and unable to remain in bed. AH-Decl. ¶¶ 7, 15. She imagines her son struggling with "a masked, armed, savage human beast" and believes Eitam "surely knew he was going to be murdered" and that Naama would also be killed. *Id*. ¶ 7. The thought of Eitam's final moments "will never be erased" from Anne's mind. *Id*. It is a vision from which she "cannot escape." *Id*.

Anne reflected on the years before Eitam was murdered and how, three months before his death, he was "awarded Israel's most prestigious fellowship for work on his Ph.D. at Tel Aviv University's Jewish history department. AH-Decl. ¶ 9. Eitam was training to become "a social historian of Jews of Eastern Europe." *Id*. Anne believes, had he not been murdered, "the world of Jewish studies would have had an outstanding, venerable scholar." *Id*. According to "his doctoral mentor, Prof. David Assaf," Eitam was a "'wunderkind.'" *Id*. ¶ 10. He published his first work at age 22 and authored "two acclaimed books and more than 40 scholarly articles," with a third book slated for publication and a fourth nearing completion. *Id*.

In addition to being a respected Torah scholar sought out by veteran scholars for his insights, Eitam was a "family man." *Id*. ¶¶ 11-12. He was his parents' "spiritual heir" – learning "creative and innovative thinking from his father, who is a world-renowned Rabbinic authority, particularly on women's issues related to Jewish observance," and assisting Anne in building "a groundbreaking world center of Torah scholarship and Jewish Law for women." *Id*. ¶ 13. She feels Eitam's presence at work, evoking both pain and gratitude. *Id*.

Anne describes the "immense pain" she endured burying her youngest son, "with whom I had a unique bond." AH-Decl. ¶ 15. Her husband, Rabbi Henkin, suffered similarly and "as a result of the murder, grief, stress and trauma sharp deterioration into an advanced stage" of his Parkinson's Disease. *Id*. ¶ 16. Anne relates how Rabbi Henkin undergoes "uncontrolled bouts of sobbing" and has lost his ability to concentrate or work. *Id*. And because Eitam played a "central role" caring for his father, his absence has "imposed a greater burden" on Anne, who has had to assume "effectively all of his responsibilities that were once his to perform" while her own "physical and mental condition has weakened terribly." *Id*. ¶¶ 17-18.

Since the October 1 attack, Anne has become increasingly "conscious and fearful of terrorism" and anxious when her children travel. AH-Decl. ¶ 20. She is "constantly upset and impatient" and has "lost interest in many activities [she] previously enjoyed." *Id*. ¶¶ 20-21. To alleviate her distress, Anne sought treatment from Ilana Goldberg, "a psychotherapist qualified in Post-Traumatic Stress Disorder (PTSD)," whom she saw "weekly for two hours per session. *Id*. ¶ 23. Rabbi Henkin joined her "much of the time." *Id*. According to Anne, Ms. Goldberg diagnosed her with PTSD. *Id*. Anne has also attended "group counseling sessions" with Dr. Naomi Baum, a psychologist. *Id*. ¶ 24.

Since the attack, Anne has had to "force" herself to go to work at the "acclaimed Center for Higher Jewish Studies for Women," which she and her husband founded and of which she is the Dean. AH-Decl. ¶ 25. Eitam was a member of the faculty and Anne's "designated successor." *Id*. She feels his loss acutely when at work. *Id*.

Anne believes Eitam's loss has "accelerated the process of aging." AH-Decl. ¶ 27. Her lack of sleep has affected her memory and sapped her energy. *Id*. She has lost the desire to exercise and has "gained considerable weight." *Id*.

Anne's stated injuries include "extraordinary grief, fear, stress and anxiety, extreme

mental anguish, weight gain, pain and suffering, severe emotional distress and loss of the

affection, love, society and companionship of my loved son, Eitam, all of which continue to

affect me to this day.  AH-Decl.  ¶ 28.

**Mental Health Treatment Records Provided by Judah and Anne Henkin**

For one year following the terrorist attack, Rabbi Henkin and Anne saw Ilana Goldberg,

"a psychotherapist who specializes in Post-Traumatic Stress Disorder."  JHH-Decl. ¶ 8.  Anne

attended weekly, two-hour sessions; Rabbi Henkin went "less frequently."  *Id*.

According to her Treatment Summary, Ms. Goldberg observed Rabbi Henkin and Anne

undergoing "immense pain and severe physical vulnerability in Rabbi Yehuda [Rabbi Henkin],

because of the Parkinson [sic] Disease from which he suffered, and which worsened since the

tragedy, and throughout our meetings."  Treatment Summary at 1.  She describes Rabbi Henkin's

"difficulty in regulating his emotions, containing them and, in general, being able to express

them."  *Id*. at 2.  Ms. Goldberg "worried about continuing the treatment because of his outburst

of pain (with terrible crying and it was difficult to calm him down)."  *Id*.  Eitam was described as

Rabbi Henkin's "son, friend, study partner and the one who was continuing in his footsteps."  *Id*.

Eitam's death was particularly difficult as Rabbi and Anne Henkin who "could not pass on to

their grandchildren – Eitam's children – some of the traditions and spirit of their parents, that the

grandchildren has [sic] not managed to experience and integrate into their own lives."  *Id*.

Ms. Goldberg observed how Rabbanit Chana [Anne] "dealt with her husband with

extreme softness and endless dedication and bore the terrible pain that affected many levels of

her life, both in the extreme mourning and in coping with her husband's illness, that was

deteriorating."  Treatment Summary at 2.  Anne took over many tasks that Rabbi Henkin had

taken care of before the tragedy.  *Id*.  She developed "severe sleeping difficulties" and "the immense pain was expressed in a post-traumatic disorder, and in reliving pictures of the attack in her mind, the funeral, worrying about the children, a sense of helplessness and anxiety."  *Id*.  Anne also worried about helping her grandchildren "recover from seeing their parents being murdered, the loss and the need to adjust to a new life."  *Id*.  Anne and Rabbi Henkin accepted that they could not raise the grandchildren themselves, but the children stayed at the Henkin home every second weekend and on Jewish holidays.  *Id*.

Ms. Goldberg's treatment of Anne and Rabbi Henkin "dealt first and foremost with the ability to express their terrible pain in words, to rebuild the ground on which they stood and construct a new reality."  Treatment Summary at 3.

Rabbi Henkin, Anne and their children and spouses also saw Dr. Naomi Braun "once or twice monthly for group counseling sessions."  JHH-Decl. ¶ 9.  Naomi L. Baum, Ph.D., "a psychologist specializing in the field of trauma and resilience building," is "trained to work with families and children."  Dr. Baum produced an Intervention Letter summarizing her treatment of the family.

According to the Intervention Letter, Rabbi Henkin, Anne, the five remaining children, and four of their spouses met with Dr. Baum on November 23, 2015.  Dr. Baum observed, "that the family was in a crisis, still reeling and suffering from the horrific murder of their son/brother and his wife; the focus of the session was more on the technicalities of taking care of their orphan children, particularly on weekends and holidays when they would be spending time with the Henkins."  *Id*.

Acknowledging that the family members did not wish to focus on their "mental health and emotions," Dr. Baum observed how they "shared their worry about how they would get

along together without Eitam, who was the family's peace-maker who got along with everybody." Intervention Letter at 1. Dr. Baum noted how the Henkins "were quite guarded with their feelings, yet the pain and distress that all were feeling was palpable." *Id.* It was clear that "the burden of assisting in bringing up the young orphans was being placed on the Rabbi, who suffers from Parkinson's Disease, and the Rabbinat who heads up a large educational institution, both of whom are well beyond the age of raising you children, which added additional worry and concern for all." *Id.* at 1-2.

Between November 2015 and July 2016, Dr. Baum met with various family members on seven occasions in group sessions that lasted approximately 2.5 hours. Intervention Letter at 2. The meetings "continued to focus on the relationship with the orphan children" but also allowed the family members to "express[] their grief, anger, loss, sadness within the family." *Id.* As time passed, "several family members dropped out of the meetings, finding it difficult or unhelpful to discuss Eitam's death, yet a core group continued to meet to process the dynamic situation, the needs of the Rabbi and Rabbinat *vis a vis* taking care of the young children, and also a processing of their loss and grief." *Id.* "All the family members showed up to at least half of the meetings." *Id.* The last two meetings focused on planning the memorial service on the anniversary of the murder, which "was, again, another way for the family to process their horrific loss." *Id.*

Dr. Baum noted that the "trauma suffered by the Henkin family was particularly horrific because of the nature of the murders, the fact that both parents were killed, and the fact that the children were present and witnessed their parents' murder." Intervention Letter at 2. And although the "family members were not upfront with their feelings and their ability to talk about the incident was limited, they were all clearly under great distress." *Id.* at 3. Dr. Baum "steered

away from psychological jargon and diagnosis according to the DSM," but it "was clear" to her "that some family members were experiencing significant post-traumatic symptoms including disturbed sleep, flashbacks of hearing about the murder, imagining the last moments of their loved one, and picturing what the children had seen." *Id*. Dr. Baum did not, however, render "a diagnosis of PTSD, but merely noted that family members were experiencing considerable symptoms." *Id*.

**Evidence Supporting Claims of Jacob Bechor-Shalom Henkin – Eitam Henkin's Brother**

Jacob Henkin's prayer for compensatory relief is supported by a declaration dated August 4, 2020 ("JaH-Decl."), and an appended photograph of Eitam and Joseph as children. Joseph also furnished an economic report prepared by Chad L. Staller, J.D., MBA, MAC, CVA of the Center for Forensic Economic Studies (the "CFES"), dated March 2, 2021, in support of his claim for financial relief.

### Testimony

Jacob Henkin was born in New York in 1972 and, at all times, has been a U.S. citizen. JaH-Decl. ¶ 2; Birth Certificate. Jacob describes his relationship with his younger brother, Eitam, as "close." *Id*. ¶ 8. Jacob lived at his parents' home, where he often saw Eitam, who visited to help care for their father. *Id*. The brothers saw each other "once every couple of weeks" and even more frequently when Eitam worked at their mother's school, where Jacob was a network administrator. *Id*. ¶ 11. Given their 12-year age difference, Jacob often babysat for young Eitam and would read books to him, take him to "the library, the museum and on bike rides." *Id*. ¶ 12. As Eitam grew up, Jacob would take him on "weekly camping trips to the Jerusalem Forest with all of my siblings' families." *Id*.

On October 1, 2015, the entire Henkin family gathered at Rabbi Henkin and Anne's home to celebrate Sukkot.  JaH-Decl. ¶ 4.  After his siblings left, Jacob noticed his mother receiving frantic phone calls from friends and family, prompting him to search online to see if a news bulletin was circulating.  *Id*.  He soon learned of a "terrorist shooting attack and murder in an area outside of Schem (Nablus)" but did not suspect Eitam was a victim as he lived far from that scene.  *Id*. ¶ 6.  Later that evening, Jacob's mother told him "that something very serious happened to [his] brother and his wife when they were driving outside of Schem."  *Id*.  Jacob "immediately" made the connection that Eitam and his wife, Naama, were the ones killed in the terrorist attack.  *Id*.  Jacob "was in terrible shock" and worried about Eitam's children, who were traveling with their parents at the time.  He later learned the children had survived.  *Id*. ¶ 7.  When Jacob learned of Eitam's murder, he "experienced extraordinary grief, tremendous fear, mental anguish, emotional distress and general physical and mental weakness."  *Id*. ¶ 9.

Since Eitam's death, Jacob's "quality of life" and "career have been significantly impacted," and although he does his "best" to cope, it still impacts him.  JaH-Decl. ¶ 10.  He has "cut down" his time at work to care for his family – from 80-90% to 40-50%.  *Id*. ¶ 15.  The reduction "was primarily because my parents needed a lot more help after Eitam's death as my father's condition dramatically worsened, and my mom still had a full-time job as the dean of a school."  *Id*. ¶ 16.  According to Jacob, "[t]he slowing down of work affected my current and future career as a network administrator."  *Id*.  Eitam's death "severely impacted" his parents, which, in turn, affected him.  *Id*. ¶ 17.  Jacob believes his father's Parkinson's Disease was "exacerbated" by Eitam's murder and that his "general health" started "deteriorating" at an accelerated rate that affected "his motor skills and his ability to walk and talk."  *Id*.  Jacob does not indicate when his father was diagnosed with Parkinson's Disease.  To assist his parents,

Jacob pays for "insurance, testing, maintenance, and gas" and drives his father "back and forth to the hospital [–] up to four times a week at one point." *Id*. ¶ 18.  He also walks his father "back and forth to Temple on Shabbat, which is challenging because of the Parkinson's."  *Id*.  Jacob also shops for food and drives Eitam and Naama's children back and forth between their grandparents' houses.  *Id*.

Jacob suffers from "severe anxiety and road rage because [his] brother was killed in his car." JaH-Decl. ¶ 19.  He has become a "much more aggressive driver" and instinctively speeds away from other drivers that drive suspiciously.  *Id*.  Jacob professes to have "much less control" over his anger and has become increasingly less patient – traits that have "create[d] a lot of challenges in maintaining relationships." *Id*. ¶ 20.  He is "more withdrawn" and does "not bother much anymore to engage in social activities such as public events." *Id*. ¶ 21.  Jacob has "no social life" and "see[s] no point in different things that were once very important to [him]."  *Id*. ¶¶ 21-22.  He has also refrained from dating as he could not bear to lose another person he loved. *Id*. ¶ 23.  Jacob no longer exercises regularly, has "become more cautious," is "sometimes" fearful, has nightmares, and avoids some of the "adventurous activities" he once enjoyed, such as hiking and biking.  *Id*. ¶¶ 24-27.

According to Jacob, Eitam's death has resulted in "mental anguish, physical weakness, pain and suffering, severe emotional distress and loss of the affection, love, society and companionship."  *Id*. ¶ 30.

**<u>Economic Damages</u>**

Jacob Henkin also seeks compensation for all past and future monetary losses incurred due to his brother's death.  To support his prayer for economic relief, Jacob tendered a report dated March 2, 2021, generated by Chad L. Staller, J.D., MBA, MAC, CVA (Certified Valuation

Analyst) and Stephen M. Dripps, M.Fin., CVA, President and Senior Economist, respectively, of CFES ("JaH-Econ. Rep.").  The CFES' expertise evaluating the lost earning of FSIA claimants has been acknowledged in other terrorism cases, including *Neiberger v. Islamic Republic of Iran*, 2022 WL 17370239 (D.D.C. Sept. 8, 2022), *Sheikh v. Islamic Republic of Iran*, 485 F. Supp. 3d 255 (D.D.C. 2020), *Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54 (D.D.C. 2018), and *Onsongo v. Republic of Sudan*, 60 F. Supp. 3d 144, 149 (D.D.C. 2014), *aff'd in part, rev'd in part on other grounds sub nom Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir.  2017).

The CFES calculated Jacob's economic losses after reviewing the "August 4, 2020 Declaration of Jacob Henkin; 2014 to 2020 Monthly Pay Statements of Jacob Henkin and the January 2021 Monthly Pay Statement of Jacob Henkin."  JaH-Econ. Rep. at 1.  The CFES overlaid information gleaned from those sources against statistical data generated by the Office of Economic Co-operation and Development ("OECD"), *Economic Indicators* (Jan. 2021), *Economic Report of the President* (Feb. 2021), and tax summaries generated by PwC, an accounting and consulting firm.

The CFES then factored Jacob's employment as a network administrator who "decreased his hours worked from 80%-90% of full-time employment to 40%-50% of full-time employment" to "take care of his family, primarily his parents."  JaH-Econ. Rep. at 2.  In formulating a forensic analysis of his economic losses, the CFES assumed that Jacob, 43.2 years old when his brother was killed, (1) would have retired from his position at the "national retirement age for men in Israel, which is age 67.0," *or* (2) would have retired at age 69.4, based on the OECD's "calculated effective retirement age, as of 2018, for Israeli men."  JaH-Econ. Rep. at 2-3.

The CFES then adjusted Jacob's income projections for taxes (at an "effective tax rate, absent and given the incident of 8.95% and 8.53% of annual earnings, respectively"), JaH-Econ. Rep. at 4; fringe benefits in the form of "employer contributions to national insurance benefits and personal contributions to national insurance benefits, and estimated Jacob's "fringe benefits" "absent the incident" at a rate of 4.28% and, "given the incident," utilized a "net benefit amount of 5.99%." *Id*. at 5.  In calculating present value, the CFES made a distinction between the "rate of return on the principal and that received on the reinvested interest" using the average yield on high-grade Municipal Bonds between February 2020 and January 2021 at 2.29% on the return on the principal investment and a rate determined from the same bonds from 2001 to 2020 of 4.04% per year to estimate the return on the reinvested interest.  *Id*.  To estimate Jacob's "earning capacity absent the incident," the CFES utilized his 2014 annual earnings and deducted his reported earnings from 2015 to 2020.  *Id*. at 3.  Based on these calculations, the CFES estimated Jacob's total lost earnings to range between $174,158 and $191,977 (574,779 NIS to 633,588 NIS).

**Evidence Supporting Claims of Joseph Gil Henkin – Eitam's Brother**

Joseph Henkin supports his claim for damages with a declaration dated August 4, 2020 ("JoH-Decl."), a copy of his birth certificate, and an economic report generated by the CFES dated March 1, 2021 ("JH-Econ. Rep.").

### Testimony

Joseph was born in June 1976 in Israel and, at all relevant times, has been a dual citizen of the United States and Israel.  JoH-Decl. ¶ 2; Department of State, Certificate of Birth Abroad of a Citizen of the United States of America.

Joseph was nine years older than Eitam and, growing up, enjoyed playing soccer with his younger brother.  JoH-Decl. ¶ 11.  As Eitam got older, the two grew consistently closer – both pursuing careers as historians.  *Id*. ¶¶ 8, 13.  Joseph laments not having the opportunity to collaborate with Eitam, "who had a strong knowledge of Jewish law as well as being a historian." *Id*. ¶ 10.  Joseph valued Eitam's opinion, and before publishing an article, he would often send an advance copy to Eitam for comment.  *Id*. ¶ 13.  The brothers shared "a lot of common views" and "enjoyed finding strange stories and anecdotes from throughout history to share with each other and laugh about together." *Id*. ¶ 14.  After Eitam's death, Joseph helped complete Eitam's unfinished biographical manuscript so it could be published posthumously.  *Id*. ¶ 15.

On October 1, 2015, Joseph joined his parents, their children, and their grandchildren for a hike and a family meal to celebrate the Jewish holiday of Sukkot.  JoH-Decl. ¶ 4.  The gathering lasted until three in the afternoon, after which Joseph attended a concert.  *Id*. ¶ 5.  While at the concert, Joseph received a message from and spoke with his mother, who relayed her concern that she had not heard from Eitam, and there had been reports of a terrorist attack involving a car with the same color, make and model as Eitam's.  *Id*.  Joseph contacted his brother-in-law, who confirmed that Eitam and his family were victims of the attack but had no information as to fatalities.  *Id*.  Joseph later learned that Eitam and Naama had been killed but was unable to discover the status of their children.  *Id*.  Around midnight, "the Army village security network" informed him that all four children survived.

Joseph discovered that Eitam, his wife, and his children were traveling to meet friends "when Hamas terrorists shot at his car from their vehicle."  JoH-Decl. ¶ 7.  Eitam managed to steer to the side of the road.  *Id*.  He was approached by the attackers who struggled with Eitam

before shooting him and Naama in front of their children.  *Id*.  One attacker "apparently accidentally shot another" and, together, drove away.  *Id*.  Joseph believes the accidental shooting "saved the children from death or kidnapping."  *Id*.  He recalls experiencing "extraordinary grief, tremendous fear, mental anguish, emotional distress and general physical and mental weakness" when he learned of Eitam's murder – conditions that "continue to affect [him] to this day."  *Id*. ¶ 9.

Since Eitam's death, Joseph has found it "harder to concentrate," and his "pace of work" and "publishing rate as a military historian slowed."  JoH-Decl. ¶ 16.  He explains how he was nearing the completion of a book about Rhodesia for publication, "but because of the tragedy, it took me another four years to finish the work, which was not published in Hebrew until early 2020."  *Id*.  According to Joseph, in 2018, he received a "Revise and Submit again" letter from Cambridge University Press, "one of the most prestigious academic publishers in the world."  *Id*. And while the project "should have taken [] 3-4 months" to complete, after more than a year and a half, he was unable to complete his revisions "due to my much lower work efficiency."  *Id*.

Joseph believes his slower pace of work has also affected his "current and future career." JoH-Decl. ¶ 17.  He explains that, although he has retained his job as a lecturer at the "Israeli Army command and Staff college" his "chances of getting a tenure at an Israeli university has decreased" due to his "diminished performance during these critical years" in his "prime as a thought leader in my field."  *Id*.  Joseph also does "not bother much anymore to engage in daily academic activities such as events and conferences, all of which contribute to the strength of my academic network and my chances of getting into a tenure track."  *Id*. 18.

Joseph "see[s] no point in different things that were once very important" to him, such as "fulfilling [his] role as a father and being there for [his] daughters."  JoH-Decl. ¶ 19.  His grief

has also affected his health, decreased his level of fitness, and damaged his "overall athletic performance." *Id*. ¶ 20. He has become fearful and carries "his handgun when he goes out and thinks about how to position himself in case a terrorist were to arrive and engage in murderous activity." *Id*. ¶ 21. He is "more cautious, sometimes over-cautious" and avoids "some adventurous activities" that he used to do. *Id*. ¶ 22.

Joseph claims the murder has taken a toll on his family, too. JoH-Decl. ¶ 23. He maintains that his wife "is much more prone to depression and crying ever since the murder," and Joseph's "third daughter" has had "fears and nightmares" for which she underwent "professional psychological help for months." *Id*. Joseph believes his father's Parkinson's Disease was aggravated due to his grief over Eitam's death. *Id*. ¶ 24. He observes that his father's health condition "started deteriorating at a faster rate than before, and things that we thought were stable suddenly became unstable." *Id*. Joseph's mother, who is the "head of a women's institute in Jerusalem," where Eitam worked, is "distracted much more easily" and has a "more limited attention span." *Id*. ¶ 25.

Joseph has "endured extreme mental anguish, physical injury, pain, suffering, severe emotional distress and loss of the affection, love, society and companionship of my loved brother, Eitam." *Id*. ¶ 27.

### **Economic Damages**

Joseph Henkin supported his claim for economic damages with a report dated March 1, 2021, prepared by the CFES. (JoH-Econ Rep.).

The CFES calculated Joseph's economic losses after reviewing Joseph's "Economic Questionnaire; August 4, 2020 Declaration of Joseph Henkin; November 2017 Revise and Submit Notice from Cambridge University Press; Human Resources Documentation of The

Hebrew University of Jerusalem; December 2020 Pay Statement of Joseph Gil Henkin."  JoH-Econ Rep. at 1.  The CFES overlaid information from those sources against statistical data generated by the OECD, *Economic Indicators* (Jan. 2021), *Economic Report of the President* (Feb. 2021), and tax summaries generated by PwC, among others.

When calculating Joseph Henkin's economic losses, the CFES considered that Joseph, 39.3 years old when his brother was killed, was employed by the Israeli Army Command and Staff College as a lecturer and "has been unable to realize his aspirations of becoming a Tenured Professor at a university."  JoH-Econ. Rep. at 2.  The CFES also factored in Joseph's contention that his brother's death caused him to "suffer[] from a lack of productivity and performance in his prime working years as it relates to academic activities such as publishing historical literature and attending conferences to strengthen his academic network," which have resulted in "his chances of securing a Tenured Professor position [being] considerably decreased."  *Id.*

To estimate Joseph's earning capacity "absent the incident," the CFES assumed he "would have secured a Tenured Professor position, consistent with his pre-incident career intentions, by January 1, 2017," and then "utilized the total monthly compensation for senior academic staff at the Hebrew University of Jerusalem, 31,652 NIS, as a proxy for what Mr. Henkin would have expected to earn as a Tenured Professor."  *Id.* at 3.  Finally, the CFES deducted from that amount Joseph's current monthly compensation of 23,744 NIS, beginning on January 1, 2017.  *Id.*

The CFES offered "two worklife estimates": the first is based on the Israeli national retirement age for men, which is 67.0, while the second implements the OECD's effective retirement age for Israeli men, which in 2018 was 69.4 years.  JoH-Econ. Rep. at 2.  The CFES then adjusted Joseph's income projections for taxes at an "effective rate of 24.73% absent the

incident" and a rate of 21.23% "given the incident."  JoH-Econ. Rep. at 3.  Employer contributions to Joseph's national insurance benefits and Joseph's personal contribution to national insurance benefits absent the incident were calculated at a "net benefit amount of 1.11%" and "given the incident" at 1.28%.  *Id*. at 4.  In calculating present value, the CFES distinguished between the "rate of return on the principal and that received on the reinvested interest" using the average yield on high-grade Municipal Bonds between February 2020 and January 2021 at 2.29% on the return on the principal investment and a rate determined from the same bonds from 2001 to 2020 of 4.04% per year to estimate the return on the reinvested interest.  Based on these calculations, the CFES estimated Joseph's total lost earnings to range between $422,576 and $455,380.  (1,394,464 NIS to 1,502,904 NIS).

**Testimony of Eliashir Elijah Henkin – Eitam Henkin's Brother**

Eliashir Henkin's claim for damages is supported by a declaration dated August 12, 2020 ("EH-Decl.").

Eliashir was born in 1978 in Israel and, at all relevant times, has maintained dual U.S. and Israeli citizenship.  EH-Decl.  ¶ 2.

Eitam was the youngest boy in the family, and growing up, Eliashir "took care of him most directly because we were only a few years apart in age." EH-Decl. ¶ 9.  Eliashir recalls taking Eitam "to the park and spending a lot of time with him."  *Id*.  During summer vacations, Eliashir and Eitam traveled to Jerusalem together and enjoyed going to the library and museums, playing sports and training in martial arts.  *Id*.

As Eitam grew up, he became Eliashir's Rabbi, which was "strange" given that Eitam was younger, but logical, as Eitam "was an amazing, understanding and knowledgeable Rabbi."

EH-Decl. ¶ 10.  Eliashir was able to confide in his younger brother on "very private matters," and Eitam gave him answers that "were helpful, meaningful and personal."  *Id.*

Losing Eitam changed the course of Eliashir's life.  EH-Decl. ¶ 6.  Eliashir had to identify his brother's "bullet-riddled body," images of which continue to be "sear[ed]" into his mind.  *Id.* ¶ 7.  To this day, when Eliashir sees a car similar to the one Eitam was driving the night he was killed, his "imagination goes immediately back to the pictures of their bullet-ridden car."  *Id.* ¶ 8.  Eliashir feels he "must play my part supporting and helping my nieces and nephews" but finds "it hard" as nothing he can say would console them.  *Id.* ¶ 11.  His attempts to be a comforting voice  "drains" him of "much energy" and "deepens" his "trauma even further.  *Id.*  Since his brother's murder, Eliashir "can hardly find the energy" he once had in his "work as a weightlifting coach" or in his hobbies like "tai chi, martial arts, hiking, writing directing videos and cooking."  *Id.* ¶ 12.  These pursuits now feel "almost pointless," and because he no longer works as "efficiently" as he once did,  Eliashir has experience "financial hardships." *Id.*

Eliashir is an "introvert by nature," and Eitam acted as a "bridge" between him and the rest of the family.  EH-Decl. ¶ 13.  Eitam encouraged Eliashir to participate in family activities and helped them "all get along together."  *Id.*  Since Eitam's death, the family "does not get together" as often because "Eitam was the glue" keeping them close.  *Id.* ¶¶ 13-14.

Eliashir observes that his brother's death has "been tremendously painful" for their parents.  EH-Decl. ¶ 15.  He, too, believes his father's Parkinson's Disease "significantly worsened" after Eitam's death and has adversely impacted his "ability to walk and talk."  *Id.* And his mother, as the head of the school where Eitam lectured, also suffers as she "is reminded

of him every day when she goes to work." *Id.*  Eliashir now finds it "very difficult to communicate with her." *Id.*

As an "introvert," Eliashir is uncomfortable with the attention he receives from strangers over his brother's death and feels his "privacy" has been "lost forever." EH-Decl. ¶ 16.  He feels compelled to maintain his composure and make "small talk" with strangers, which only "rub[s] salt onto my open wounds, and rob[s] me of the choice of when and how to face my loss and grief." *Id.*

### Testimony of Aderet Rivka (Henkin) Stern – Eitam Henkin's Sister

Aderet Stern supports her claim for damages through a declaration dated August 24, 2020 ("AdH-Decl.").  Aderet was born in February 1981 in Israel and, at all relevant times, has maintained dual citizenship with Israel and the United States.  AdH-Decl. ¶ 2.

Growing up, Aderet enjoyed a "close" relationship with Eitam, with whom she shared a room until their sister Taama was born.  AdH-Decl. ¶ 10.  The two rode bikes, played together, took walks and helped their mother prepare for Shabbat.  *Id.* ¶ 11.  Aderet "very much played the role of a protective older sister" and, until she married, lived with Eitam at their parents' home. *Id.* ¶ 12.  She recalls fondly the pride she felt at Eitam's Bar Mitzvah and the fun she had at Eitam and Naama's wedding.  *Id.* ¶ 14.

On the day Eitam and Naama were killed, Aderet was watching television with her husband and father-in-law when the newscaster reported that a terrorist attack had taken place. AdH-Decl. ¶ 5.  Knowing Eitam lived near the attack's location, Aderet unsuccessfully tried to contact him on his phone.  *Id.*  Aderet's friend then sent her a text message with a "crying emoji" but did not respond when Aderet asked if she had information about the attack.  *Id.*  Aderet had a

bad feeling but went to bed.  *Id.*  One-half hour later, her mother called and broke the news to her.  *Id.*

The "cruel murder" "changed the course of [Aderet's] life."  AdH-Decl. ¶ 7.  She has since become "much more anxious" and "stressed."  *Id.* ¶ 8.  Aderet is "in a constant state of grieving" and thinks about Eitam "every day" and about "his last moments" and "final thoughts."  *Id.* ¶ 8.  She has a "permanent fear of other family members being hurt," her "sense of security has been damaged," and she is afraid to travel.  *Id.* ¶¶ 15-17.  Aderet also has become "more suspicious of people" and, even through a smiling façade, is "broken" and "always suffering."  *Id.* ¶¶ 18-19.  She also worries about her children and "has to know where each and every one is" at all times, which "does not help [her] mental health and keeps [her] in a near-constant fear."  *Id.* ¶¶ 20-21.

Aderet keeps a picture of Eitam and Naama in her home near where she lights the Shabbat candles.  AdH-Decl. ¶ 24.  She keeps the picture there because she is "thinking about him, sometimes praying for him in my heart and even crying a little bit."  *Id.*

Aderet has

[s]uffered and continue to suffer because of the pain inflicted by the Defendants, the Islamic Republic of Iran and the Syrian Arab Republic.  As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of the Defendants-specifically, the act of shooting and killing of my brother Eitam-I have endured extreme mental anguish, pain and suffering, severe emotional distress and loss of the affection, love, society and companionship of my loved brother, Eitam.

AdH-Decl. ¶ 25.

## Testimony of Taama Freida (Henkin) Yaakovson – Eitam Henkin's Sister

Taama Yaakovson supports her prayer for relief through a declaration dated August 13, 2020 ("TY-Decl.").  Taama was born in June 1987 in Israel and has always maintained dual U.S. and Israeli citizenship.  TY-Decl. ¶ 2.  Taama is Eitam's sister and the closest to him in age of all

the siblings.  *Id*.  Growing up, they played together, and he taught her how to read.  *Id*.  ¶¶ 9, 14.
Taama admired Eitam and considered him a "role model" and the family member who best
understood her.  *Id*. ¶ 14.

On the night Eitam was murdered, Taama was hosting a party at the school where she
worked.  TY-Decl. ¶ 4.  During the party, Taama's mother called her to report she had "heard
news of a terror attack on the road that she knew Eitam's family would have been traveling
along."  *Id*.  At the time, the victims' identities were unknown, and Taama's mother could not
reach Eitam on his phone.  *Id*.  Later that evening, Taama's husband learned that Eitam and his
wife had been killed in the terror attack; he went to Taama's school to deliver the bad news.  *Id*.

The murders of Eitam and his wife Naama "changed the course of [Taama's] whole life."
TY-Decl. ¶ 5.  She now lives in "permanent fear" that other family members will be attacked.
*Id*. ¶ 6.  Taama has been "robbed" of the family member with whom she could share her
experiences, consult with, and who would help her in moments of need.  *Id*. ¶ 15.

Taama describes Eitam as a "key member" of her family and someone with "the ability to
effectively solve conflicts" within it.  TY-Decl. ¶¶ 7, 11.  Since his death, the family has
"experienced more frequent and more intense" internal conflicts, which have become
increasingly difficult to resolve.  They are no longer as close as they once were.  *Id*.  Eitam
"would always lead the family, from a religious standpoint, and give speeches at significant
family events."  *Id*. ¶ 8.  When Taama met her future husband, she introduced him to Eitam first,
as his "approval was particularly important" to her.  *Id*. ¶ 10.

As a result of Eitam's death, Taama's parents "face insufferable sadness, which hurts
their quality of life, and makes it harder for them to go on with their daily lives."  TY-Decl. ¶ 13.
Her parents "direct a great part of their energy to Eitam and Naama's children, who grow up now

at Naama's parents' home but frequently visit with my parents." *Id*. The two families "have very different worldviews," which causes "significant tension and communication problem." *Id*. Taama has taken on "more family responsibilities, both in the context of general needs of the family and specifically helping [her] sick father who suffers from Parkinson's Disease." *Id*. ¶ 16. Taama believes had Eitam been alive, "he would have continued to take on substantial responsible [sic] for this care and help." *Id*.

Following her brother's death, Taama lost interest in many activities she once enjoyed. TY-Decl. ¶ 18. "Every weekend," she "experiences times of sadness" when she cannot be emotionally available for her children. *Id*. ¶¶ 18, 22. Her sadness intensifies during holidays and special events. *Id*. Taama is "involved with keeping Eitam's legacy," but this, too, is painful. *Id*. ¶ 18. She contemplated making "a movie about Eitam's life, both so that my children could learn more about him and because I think the world needs to know about the amazing person whose life was tragically taken in an act of hatred and senseless violence." *Id*. ¶ 19. Her plan proved to be "impossible" as it was too painful for the family to participate. *Id*. According to Taama, her children are "exposed to my pain and struggle and it hurts them too. For example, my daughter, who was 4.5 years old at the time of the murder, cries a lot when Eitam is mentioned or when she feels my pain." *Id*. ¶ 22.

Taama has "suffered and continues to suffer because of the pain inflicted by the Defendants, the Islamic Republic of Iran and the Syrian Arab Republic." TY-Decl. ¶ 24. She has "endured extreme mental anguish, pain, [] emotional distress" over the "loss of the affection, love, society and companionship of [her] beloved brother Eitam."

## ANALYSIS

Upon review of the testimonial and documentary evidence presented, and in keeping with the legal framework set out below, the Special Master considers the respective claims of the Estate of Rabbi Judah Herzel Henkin, Anne Chana Henkin, Jacob Bechor-Shalom Henkin, Joseph Gil Henkin, Eliashir Elijah Henkin, Aderet Rivka Henkin Stern and Taama Freida Henkin Yaakovson.

## STANDARD OF PROOF

To "obtain damages against defendants in an FSIA action, a plaintiff must prove that the consequences of the defendant's conduct were 'reasonably certain (i.e., more likely than not) to occur, and must prove the amount of the damages by a reasonable estimate consistent with this [Circuit's] application of the American rule on damages.'" *Estate of Brown v. Islamic Republic of Iran*, 872 F. Supp. 2d 37, 41 (D.D.C. 2012) (citing *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005) (quoting *Hill v. Republic of Iraq,* 328 F.3d 680, 681 (D.C. Cir. 2003).

As default winners under the FSIA, plaintiffs "must prove damages 'in the same manner and to the same extent as any other default winner.'" *Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 242-243 (D.D.C. 2012) (quoting *Wachsman v. Islamic Republic of Iran*, 603 F. Supp. 2d 148, 160 (D.D.C. 2009)).  When assessing these claims, courts in this jurisdiction carve a "'clear distinction' in the standard of proof necessary to establish a plaintiff's *entitlement* to damages and to assess the *amount* of those damages." *Rhodes v. United States*, 967 F. Supp. 2d 246, 313-314 (D.D.C. 2013) (emphases in original) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931)).

For future damages, courts require that a plaintiff demonstrate entitlement to a "reasonable certainty" or by a preponderance of the evidence and prove damages by a "reasonable estimate." *Hill*, 328 F.3d at 684.  For past losses, a plaintiff must "prove the *fact of injury* with reasonable certainty," *Samaritan Inns, Inc.  v. District of Columbia*, 114 F.3d 1227, 1235 (D.C. Cir. 1997) (emphasis added), yet need only "reasonably prove" the amount of damages.  *Hill*, 328 F.3d at 684.

Finally, under 1605A, "[a] plaintiff may establish the necessary proof for damages through affidavits or live testimony."  *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 289 n.1 (D.D.C. 2015)) (citing *Weinstein v. Islamic Republic of Iran*, 175 F. Supp. 2d 13, 21 (D.D.C. 2001) (where the court held affidavits to be a sufficient evidentiary basis for an award of FSIA damages)).  *See also Int'l Rd. Fed'n v. Embassy of the Democratic Republic of the Congo*, 131 F. Supp.  2d 248, 250 (D.D.C. 2001) (the FSIA "requires that in the event of default, a plaintiff must prove both liability and damages . . .  [which] can be based on submission of affidavits, without the need for live testimony at a hearing.") (quoting *The Semi Conductor Materials Inc. v. Agric. Inputs Corp.*, No. 96-Civ.-7902 (LAK), 1998 WL 388503 at *8 (S.D.N.Y. June 23, 1998)).

### SOLATIUM DAMAGES
**(The Estate of Rabbi Judah Herzel Henkin, Anne Chana Henkin,
Jacob Bechor-Shalom Henkin, Joseph Gil Henkin, Eliashir Elijah Henkin,
Aderet Rivka Henkin Stern and Taama Freida Henkin Yaakovson)**

It is well established that "[a]cts of terrorism by their very definition are extreme and outrageous and intended to cause the highest degree of emotional distress."  *Belkin v. Islamic Republic of Iran,* 667 F. Supp. 2d 8, 22 (D.D.C. 2009) (citing *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)).  When a terrorist act results in death, that emotional distress, "with its attendant horrific surrounding circumstances, prevents the anguish [felt by a

relative of the deceased] from subsiding." *Estate of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 146 (D.D.C. 2018). Solatium damages are therefore available as compensation for the "mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as a result of the decedent's death, as well as the harm caused by the loss of the decedent, society and comfort," *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 83 (D.D.C. 2011) (internal quotation marks and citation omitted), even though those plaintiffs were not "present at the place of outrageous conduct." *Heiser v. Islamic Republic of Iran,* 659 F. Supp. 2d 20, 27 (D.D.C. 2009) ("*Heiser II*") (citing *Jenco v. Islamic Republic of Iran*, 154 F.Supp.2d 27, 36 (D.D.C.2001)).

Factors considered where the victim was killed include: "(1) whether the decedent's death was sudden and unexpected; (2) whether the death was attributable to negligence or malice; (3) whether the claimants have sought medical treatment for depression and related disorders resulting from the decedent's death; (4) the nature (i.e., closeness) of the relationship between the claimant and the decedent; and (5) the duration of the claimant's mental anguish in excess of that which would have been experienced following the decedent's natural death." *Stethem*, 201 F. Supp. 2d at 89-90. Of these, courts place particular emphasis on the cause of death in terrorism cases, reasoning that "the fact of death and the cause of death can become inextricably intertwined, thus interfering with the prospects for anguish to diminish over time." *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 111 (D.D.C. 2000).

Even with these guideposts, claims for solatium, unlike those for lost wages, are "undeniably difficult to quantify," *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 254 (D.D.C. 2006), and not readily susceptible to "models and variables." *Elahi*, 124 F. Supp. 2d at 111 (citations omitted). Accordingly, courts are often guided by remedial approaches and

formulas employed in similar cases.  And in cases where solatium damages are sought, most courts employ the damages model articulated in *Heiser I*.  In accordance with that framework, "courts typically award between $8 million and $12 million for pain and suffering resulting from the death of a spouse, approximately $5 million to a parent whose child was killed and approximately $2.5 million to a plaintiff whose sibling was killed."  *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006) ("*Heiser I*").  Children of a deceased victim typically receive an award of $3 million.  *O'Brien v. Islamic Republic of Iran*, 853 F. Supp. 2d 44, 47 (D.D.C. 2012) (citing *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 301 (D.D.C.2003)).

These baseline awards, while instructive, are "not set in stone," *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 74 (D.D.C. 2010), as "strict application of precedent could lead to conflicting conclusions about an appropriate award."  *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 57 (D.D.C. 2009) (*quoting Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 59 (D.D.C. 2006)).  Recognizing the flexibility inherent in these awards, courts have deviated from these numbers where circumstances dictated.

Deviations in an upward direction, for example, have been warranted: (1) in the face of "aggravating circumstances that appreciably worsen the surviving spouse's pain and suffering, such as cases involving torture or kidnapping of a spouse," *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 108 (D.D.C. 2006); (2) where the "evidence establish[es] an especially close relationship," *Spencer v. Islamic Republic of Iran*, 71 F.Supp. 3d 23, 28 (D.D.C. 2014), compared to "the normal interactions to be expected given the familial relationship," *Spencer v. Islamic Republic of Iran*, 71 F.Supp. 3d 23, 26-27 (D.D.C. 2014); (3) in the presence of "medical proof of severe pain, grief or suffering on behalf of the claimant," *Roth*, 78 F. Supp. 3d at 403;

or; or (4) where the "circumstances surrounding the terrorist attack [rendered] the suffering particularly more acute or agonizing." *Oveissi*, 768 F. Supp. 2d at 26-27.   Conversely, downward departures may be provident where the evidence suggests an attenuated relationship between the victim and his family members. *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010).   Indeed, solatium awards have been denied "where no evidence is offered to show injury that an award of solatium damages might compensate." *Roth v. Islamic Republic of Iran*, 78 F. Supp.3d 379, 405 (D.D.C. 2015).

Eitam's parents and siblings have presented colorable claims to recover for the anguish they suffered due to Eitam's death from a terrorist attack.   Each remarked on how central Eitam was to the family.   Rabbi Henkin described his devastation over Eitam's death and how he lost his "friend" and "protégé" as well as the opportunity to watch Eitam grow into his full potential as a rabbi and scholar.   Eitam's death exacerbated Rabbi Henkin's already compromised physical health, causing him great psychological stress and an inability to regulate his emotions.   Anne Henkin adored her son and is constantly plagued by thoughts of Eitam's murder.   Anne laments she will never see Eitam succeed her and take control of the academic center she and her husband founded.

Jacob Henkin was close to Eitam and continues having nightmares about his brother's death.   Since the attack, Jacob has found it challenging to form new relationships and can no longer participate in social activities.   With Eitam's death, Joseph Henkin lost a brother, a colleague, a fellow musician, and a friend with whom to share historical anecdotes.   Eitam's death changed the course of Eliashir Henkin's life.   And as the family member who identified his brother's dead body, Eliashir must live with that horrific image.   He laments losing his friend and spiritual guide.   Aderet, who was Eitam's protector growing up, never stops thinking of her

brother and describes herself as "broken" and "always suffering." For Taama, Eitam's death meant the loss of a family leader and the person who best understood her.

In short, each member of the Henkin family amply demonstrated an entitlement to an award for loss of solatium by presenting highly credible testimony that compellingly evidences the close relationships they enjoyed with Eitam and their anguish over losing his "love, affection, care, attention, companionship, comfort, guidance and protection." *Wilson v. City of Chicago*, 758 F.3d 875, 883 (7th Cir. 2014).

Despite amply demonstrating their sense of loss over Eitam's murder, the Special Master sees no need to deviate from the solatium scale articulated in *Heiser*. Despite the horrific way in which Eitam was killed, the record reveals no circumstances that aggravated the family's pain and suffering appreciably. Our courts equate aggravated circumstances with "torture or kidnapping" or situations where a " victim survives with severe physical and emotional conditions that continue to cause severe suffering." *Greenbaum*, 451 F. Supp. 2d at 108. And without minimizing the special bonds Eitam shared with his parents and siblings, the record does not suggest "an especially close relationship" beyond "the normal interactions to be expected given the familial relationship." *Oveissi*, 768 F. Supp. 2d at 26-27. Finally, Ilona Goldberg's "Treatment Summary" and Dr. Baum's "Summary of Intervention," although revealing, do not constitute "medical proof" indicative of "severe pain, grief or suffering." *Roth*, 78 F. Supp. 3d at 403.

## ECONOMIC DAMAGES
### (Jacob Henkin and Joseph Henkin)

The Special Master next considers the individual financial loss claims of Jacob Henkin and Joseph Henkin.

28 U.S.C. § 1605A, like its statutory predecessor 28 U.S.C. § 1605(a)(7), establishes a cause of action for economic damages resulting from an act of state-sponsored terrorism.  To help formulate economic losses, "[t]he report of a forensic economist may provide a reasonable basis for determining the amount of economic damages."  *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012).  Before recommending the adoption of a forensic analysis, the Special Master must first ensure the methodological soundness of the calculations, mindful that "mathematical exactitude is often impossible," *Bova v. Islamic Republic of Iran*, No. 15-cv-1074 (RCL), 2020 WL 2838582, at *11 (D.D.C. May 31, 2020), and then examine the "reasonableness and foundation of the assumptions relied upon by the expert," *Roth*, 78 F. Supp. 3d at 402, to safeguard against "speculation, contingency, or conjecture."  *Bova*, 2020 WL 2838582, at *11.

The need for scrutiny becomes enhanced when the claim for economic losses involves departures from pre-injury earnings and implicates potential future losses.  *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 727 (6th Cir. 2012).

### Jacob Henkin

Jacob Henkin's prayer for economic relief arises from the "significant[] impact[]" his brother's death purportedly had on his career.  He alleges he now works almost half the hours he did before Eitam's death due to his increased responsibilities caring for his ailing father, Rabbi Henkin, and the time he spends transporting Eitam and Naama's children between their grandparents' houses.  According to Jacob, "[t]he slowing down of work affected my current and future career as a network administrator."

Jacob's contention finds no support in the record.

Rabbi Henkin testified that, following Eitam's death, he requires "much more help and attention from his family" to assist with essential functions, as his ability to speak and walk have been compromised.  JHH-Decl. ¶ 12.  Jacob's role in that regard, however, goes unmentioned. Anne Henkin, who lived under the same roof as Jacob, was able to observe any assistance offered to her husband.  Yet according to her testimony, she was the one upon whom the "greater burden" of caring for the ailing Rabbi Henkin was "imposed."  AH-Decl. ¶ 16.  Any contribution Jacob may have provided is unmentioned.

Every sibling attested to their father's advanced frailty and declining health, yet no one cited Jacob as his caregiver.  Joseph acknowledges that, since Eitam's death, his father's "general health conditions started deteriorating at a faster rate than before, and things that we thought were stable suddenly became unstable."  JoH-Decl. ¶ 24.  The only assistance he alludes to, however, was provided by his mother.  Eliashir testifies about his father's "significantly worsened" condition and increased inability "to walk and talk," EH-Decl. ¶ 15, yet refers to no sibling as being involved in his care.

Indeed, according to Taama, she was the one who undertook the care of her father after Eitam's death:

> Now, I take on more family responsibilities, both in the context of general needs of the family and specifically helping my sick father who suffers from Parkinson's Disease. Had Eitam still been alive, he would have continued to take on substantial responsibility for this care and help.  I believe this burden will only grow, as my father's condition continues to deteriorate.

TY-Decl. ¶ 16.

Jacob's assistance is not acknowledged.

The Special Master similarly finds a lack of reliable indicia supporting Jacob's stated concern that his future career as a "network administrator" has been fatally compromised.  When

he executed his declaration, Jacob was a network administrator at the Center for Higher Jewish Studies for Women ("Center"), JaH-Decl.¶ 11, founded by Rabbi and Anne Henkin and where Anne served as Dean.  AH-Decl. ¶¶ 13, 25.  As Dean of the Center where Jacob has served as network coordinator since at least 2014, JaH-Econ. Rep at 2, Anne enjoyed a unique insight into the impact Eitam's death had on Jacob's work habits.  Despite this, Anne's detailed ten-page declaration neither acknowledges Jacob's role as network administrator nor bolsters her son's contention that Eitam's death compelled him to work fewer hours which, in turn, adversely impacted his career.

The Special Master finds these inconsistencies militate against recommending Jacob receive compensation for his purported economic losses.

### Joseph Henkin

Joseph Henkin maintains an entitlement to economic damages.  He alleges that, since Eitam's death, he has found it "harder to concentrate," and his "pace of work" and "publishing rate as a military historian slowed."  JoH-Decl. ¶ 16.  Joseph contends that when his brother was killed, he was nearing the completion of a book about Rhodesia that was slated for publication, "but because of the tragedy, it took me another four years to finish the work, which was not published in Hebrew until early 2020."  *Id*.

In support of his position, Joseph produced what he characterizes as a "Revise and Submit again" letter ("R&S Letter"), entitled: "*Review of Yagil Henkin, Like Fish in the Bush: Rhodesia at War, 1965-1980, for Cambridge University Press, November 2017*."  He maintains that the R&S Letter was from "one of the most prestigious academic publishers in the world" and a project that "should have taken [him] 3-4 months" to finish but, due to his "much lower work efficiency," remain incomplete after a year and a half.

The R&S letter suggests otherwise.  Its author states that Joseph's submission, consisting of a "proposal and the sample chapters," gives "a fairly sketchy outline of the book, with insufficient depth to judge the project's real promise"; requires "a fuller explanation of how the book makes an original contribution"; offers "no explanation as to how the book will contribute to these questions being answered in a novel way"; "needs to say much more about the types of sources consulted, and what insights they can bring to the book";  contains "insufficient detail, [], to judge whether each chapter is original"; "is difficult to follow"; contains notes "often omitting full bibliographical information for the sources cited"; contains  "numerous grammatical errors."

The R&S Letter concludes that Joseph's project "does not meet the high standards for publication expected by the Press." "[R]eluctant to recommend an outright rejection," due to the "exceptional historical importance" of the subject matter, the author suggests Joseph "submit a revised proposal and a complete manuscript in amended form."

Joseph also maintains his diminished pace of work has affected his "current and future career."  JoH-Decl. ¶ 17.  He explains that, although he has retained his job as a lecturer at the "Israeli Army command and Staff college," his "chances of getting a tenure at an Israeli university have decreased" due to his "diminished performance during these critical years" in his "prime as a thought leader in my field."  *Id*.  He further contends that he does "not bother much anymore to engage in daily academic activities such as events and conferences, all of which contribute to the strength of my academic network and my chances of getting into a tenure track." *Id*. 18.

The Special Master finds Joseph's attempt to forge a nexus between Eitam's death and his inability to have his treatise on Rhodesia accepted by one of the foremost academic

publishing houses, unavailing.  Equally unavailing is his attempt to connect the murder of his brother to his diminished chances of achieving a tenured position at an Israeli university.

The R&S Letter from Cambridge University Press appears to be more than a minor revision request.  By its terms, it was one step short of an outright rejection of Joseph's proposal, saved only by the topic's historical importance.  Whether Joseph could have successfully overcome Cambridge University's concerns in "3-4 months" is a question that begs a speculative response.  And "[a]ttributing a specific dollar amount to a book deal that never progressed past "discussions" is far too speculative to pass muster in a lost earnings calculation." *Rezaian v. Islamic Republic of Iran*, 422 F. Supp.3d 164, 182 (D.D.C. 2019).  Joseph's request to be compensated for losing a tenured position not yet offered is equally speculative as it assumes facts not in evidence and anticipates events that have not taken place.

In sum, the Special Master finds the methodology employed by CFES in calculating Jacob Henkin's and Joseph Henkin's projected economic losses in keeping with generally accepted forensic practices.  The Special Master does, however, take issue with the underlying assumptions supporting those projected losses and therefore recommends the brothers' financial claims be denied. *See Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) ("an expert's testimony should be excluded as speculative if it is based on unrealistic assumptions regarding the plaintiff's future employment prospects").

## CONCLUSION

For the aforementioned reasons, the Special Master recommends that the Estate of Rabbi Judah Henkin and Anne Henkin each be awarded Five Million Dollars ($5,000,000) and that Jacob Henkin, Joseph Henkin, Eliashir Henkin, Aderet Stern and Taama Yaakovson each receive Two Million Five Hundred Thousand Dollars ($2,500,000) in damages for loss of solatium.

Finally, the Special Master recommends the economic loss claims raised by Jacob Henkin and Joseph Henkin be denied.

Dated:  March 31, 2023                        Respectfully submitted,

                                              By:*/s/ Alan L.  Balaran*
                                                    Alan L.  Balaran, Esq.
                                                    Special Master